# COPELAND v. WABASH RAILROAD COMPANY, Appellant.

### Division Two, June 9, 1903.

1. **Negligence: RAILROAD BRIDGE: CONSTRUCTION: ALLEGATIONS.** In a suit against a railroad for damages sustained by the falling of a passenger train through a bridge, an allegation that the bridge was a "pile bridge, when it should have been a span bridge," without more, does not charge any negligence on the part of the railroad. But if this allegation, is followed by others which show, if true, why it was not the proper kind of a bridge for the particular place, and not reasonably safe, the petition will not be held to fail to state a cause of action in that particular.

2. ——: ——: ——: ——: **DUTY OF COMPANY TO EMPLOYEES.** It is the duty of a railroad company to its employees in its train service to construct and maintain reasonably safe bridges over branches and creeks crossed by its tracks, and if it fails to do so, and in consequence of such failure a conductor in charge of the train which falls through such bridge is injured, the company is liable to him in damages for such injury. But it is not the duty of the company to furnish those in charge of its trains any particular kind of a bridge, if the one furnished is reasonably safe.

3. ——: ——: **EVIDENCE: PRIMA FACIE CASE.** The fact that a railroad bridge went down under a train and the conductor was injured, does not make out a prima facie case of negligence against the railroad. It is incumbent on plaintiff to show how and why the accident occurred.

4. ——: ——: **PRIMA FACIE CASE.** The plaintiff makes out a prima facie case for a recovery of damages for his personal injuries by showing he was the conductor on defendant's passenger train which, in crossing a bridge, went down and injured him, and that the bridge was a pile one, which, on account of the character of the stream and the country drained by it, was not a reasonably safe bridge at that locality; or, that the piling which supported the bridge had become rotten, unsound and defective, and therefore was not reasonably safe; or, that there was not sufficient earth around some of the pilings to hold them in proper position, and for that reason it was not reasonably safe; or, that for any or all these reasons it fell, and injured plaintiff, and that defendant knew, or by the exercise of reasonable care and diligence might have known, of its unsafe condition before the arrival of the train.

5. ———: ———: ———: HOW OVERCOME: ACT OF GOD. When plaintiff has made out a prima facie case entitling him to go to the jury, it devolves on defendant to overcome it and to show by the weight of the evidence to the satisfaction of the jury, that the accident was attributable to some other cause. This it may do, in the case of the breaking down of a bridge through which a train fell, by showing that the water from a sudden, unforeseen, unprecedented storm, flood or waterspout, purely local in its character and not to be foreseen or provided against, had only a few brief minutes previously swept the bridge away. But where there is contradictory evidence that there was no such storm, that defense is for the jury.

6. ———: ———: CONSTRUCTION: INSTRUCTION. In a suit by a conductor to recover damages from a railroad for personal injuries caused by the plunging of his train through a bridge, it is proper to instruct the jury that the company was bound to maintain a reasonably safe bridge, and to submit to them whether or not a pile bridge, in view of the character of the stream and the area of country drained by it, was such a bridge.

7. Instructions: HOW CONSIDERED. An instruction should be considered as an entirety, and not by certain parts or words taken from it.

8. Negligence: PRIOR PHYSICAL CONDITION. Unless plaintiff's prior diseased condition had some connection with his injuries for which he sues, there is no reason why that prior physical condition should be considered by the jury in making up their verdict.

9. ———: INJURIES: ELEMENTS. In a suit for damages for physical injuries the jury should take into consideration any physical injuries to plaintiff resulting directly or indirectly from the accident.

10. ———: FORMER TRIAL: READING NEWSPAPER ACCOUNT. After the jury had retired to consider of their verdict a juror secured a newspaper which said: "Copeland is suing the Wabash railroad for $35,000 for injuries received in the wreck at Missouri City where eight men were killed. A coffin was bought for Copeland, but he recovered. A trial last term of court resulted in a hung jury. One of the jurors was for nothing, and hung to the last, while one of the others was for $20,000, two for $15,000 and eight for $10,000. There is much interest in the case." *Held*, that the fact that some of the jurors pending the trial read this article furnishes no ground for reversal of a verdict for $15,000.

11. Verdict: EXCESSIVE. A verdict for $15,000 for personal injuries sustained in a railroad wreck, is held in this case not to be excessive.

Appeal from Audrain Circuit Court.—*Hon. E. M. Hughes*, Judge.

AFFIRMED.

*Geo. S. Grover* and *George Robertson* for appellant.

(1)   The demurrer to the evidence should have been sustained.   Smith v. Railroad, 69 Mo. 32; Flynn v. Railroad, 78 Mo. 202; Huhn v. Railroad, 92 Mo. 448; Epperson v. Tel. Co., 155 Mo. 373; Bailey on Masters' Liability, p. 14; Cagney v. Railroad, 69 Mo. 423; Bohn v. Railroad, 106 Mo. 433; Blanton v. Dold, 109 Mo. 64; Steinhauser v. Spraul, 127 Mo. 562; Minnier v. Railroad, 66 S. W. 1072.   (2)   The court should have directed a verdict in favor of the defendant at the close of all of the evidence.   Flori v. St. Louis, 69 Mo. 34; Ellet v. Railroad, 76 Mo. 518; Oglesby v. Railroad, 150 Mo. 136.   (3)   The court gave erroneous instructions at the plaintiff's request.   Authorities cited, supra. (4)   The court refused proper instructions asked by defendant.   Authorities cited, supra.   (5)   There is an irreconcilable conflict in the instructions given at the plaintiff's request as compared with those given at the request of the defendant.   This necessarily confused and misled the jury to the prejudice of defendant.   Nor were the correct declarations of law given at defendant's request an antidote for the erroneous instructions given for the plaintiff. Flori v. St. Louis, supra; Dalauhi v. Railroad, 105 Mo. 645; Hickman v. Link, 116 Mo. 123; Quirk v. Elevator Co., 126 Mo. 295.   (6)   The plaintiff's counsel and the jury were guilty of misconduct in this case.   For that reason alone the verdict below ought not to stand.   Commonwealth v. Landis, 12 Phil. 576; Whitney v. Whitman, 5 Mass. 404; Carter v. State, 77 Tenn. 440; People v. McCoy, 12 Pac. 273; Hassan v. Railroad, 21 Weekly Notes of Cases 96, Dec. 13, 1887; Walker & Black v. State, 37 Tex. 389; Palmon v. State, 29 Ark. 253; 2 Thompson on Trials, sec. 2561; Farrer v. State, 2 Ohio St. 54; United States v. Ogden, 105 Fed. 371; 17 Am. and Eng. Ency. of Law, pp. 1214-1215.

*P. H. Cullen, E. S. Gantt* and *W. M. Williams* for respondent.

(1) It was defendant's duty to maintain a reasonably safe bridge across Rose creek, and it is liable to plaintiff for any injuries received by him in consequence of its negligent failure so to do. This issue was submitted to the jury under proper instructions, announcing legal principles that have frequently been approved by this court, and was found in plaintiff's favor. There can be no controversy concerning defendant's duty in that behalf, and it is liable for any injuries to plaintiff resulting from the non-performance thereof. Cobb v. Railroad, 149 Mo. 609; Williams v. Railroad, 119 Mo. 316; Stohrer v. Railroad, 105 Mo. 192; Stohrer v. Railroad, 91 Mo. 509; Lewis v. Railroad, 59 Mo. 495; Huhn v. Railroad, 92 Mo. 440; Bolen v. Railroad, 95 Mo. 263; Hirst v. Railroad, 163 Mo. 309. (2) There was ample evidence to justify the submission to the jury of the issue, whether, on account of the character of the stream, and the country drained by it, a pile bridge at the place where plaintiff was injured was a reasonably safe structure for defendant's railroad. (3) Defendant's testimony tended to show that there was an unprecedented rainfall in the vicinity of Rose creek at the time of the wreck. Plaintiff, upon the other hand, introduced evidence to the effect that, while the storm was unusual, it was not greater than others that had previously occurred in that neighborhood, and that the water in the creek had been quite as high at other times. The jury was instructed that if the accident was caused by an unprecedented and extraordinary flood, and did not result from defects in the bridge, plaintiff could not recover. Upon this issue the jury found for the plaintiff, and no complaint is made here as to the instructions upon that subject. (4) There is absolutely no foundation for the charge of misconduct on the part of plaintiff's counsel, Mr. Cullen, in reference to the jury. There is not

a scintilla of evidence upon which to base it. He was asked by the reporters of the two daily papers, i. e., the Intelligencer and the Ledger, concerning the case, and in response to their inquiries informed them how the jury stood upon the former trial and told them something about the history of the case. He did not ask that any publication be made, and there is nothing whatever to indicate that his purpose was to influence the jury "in any way, shape or form." It does not appear that any one of the jurors ever saw the articles published in the Ledger and the Intelligencer. Mr. Cullen simply responded to the inquiries of the reporters. This is the sum and substance of his offending. "Only this and nothing more." (5) The reading of a newspaper article by the juror, Crum, which purported to give a statement as to how the jury stood upon the former trial, is no ground for setting aside the verdict. Sherwood v. Railroad, 50 N. W. 101; 2 Thompson on Trials, sec. 2576; Harriman v. Wilkins, 20 Me. 93; Kerr v. Lunsford, 2 L. R. A. 668; State v. Duestrow, 137 Mo. 44; State v. Reed, 137 Mo. 425; Fuller v. Fletcher, 44 Fed. 34; 12 Ency. Pl. and Pr., 662. (6) Defendant is in no condition to take advantage of this matter, in any event. It devolves upon it, before it can ask for a new trial on the ground of misconduct on the part of a juror, to show affirmatively that its attorneys had no notice of the alleged misconduct until after the verdict was rendered. This the defendant has entirely failed to do. Thompson & Merriam on Juries, sec. 456; State v. Robinson, 117 Mo. 666; Bank v. Cooper, 48 N. E. 236; State v. Howard, 118 Mo. 127; State v. Nocton, 121 Mo. 553; Easley v. Railroad, 113 Mo. 247; City v. Cook, 120 Mo. 11; Railroad v. Welsh, 40 N. E. 650.

BURGESS, J.—This is an action for thirty-five thousand dollars damages alleged to have been sustained by plaintiff, a passenger conductor on defendant's railroad, by reason of the negligence of defend-

ant company in failing to provide and maintain a bridge which was reasonably safe. The specific allegations of the petition upon which the case was tried are as follows:

1. That said bridge was a pile bridge and on account of the character of the stream and the country drained by it, such a bridge at that place was not reasonably safe.

2. That the piling that supported said bridge had become rotten, unsound or defective, and therefore not reasonably safe.

3. That there was not sufficient earth around some of said pilings and for that reason the bridge was not reasonably safe.

The answer was a general denial.

The trial resulted in a verdict and judgment in favor of plaintiff for $15,000.

Defendant appeals.

The accident occurred by reason of the train, upon which plaintiff was discharging his duties, being ditched at Rose branch in Clay county, on June 26, 1897. Plaintiff left Union Depot at Kansas City at 6:20 that evening in charge of his train, his objective point being St. Louis. The train had to cross Rose branch, a small stream about one mile west of Missouri City, and twenty miles east of Kansas City. As it was crossing Rose branch the bridge over that stream gave way, wrecking and ditching it, by reason of which plaintiff was greatly and permanently injured.

Rose branch is a stream about three and one-half miles long, skirted upon either side by broken land and abrupt bluffs, heavily timbered. It drains about thirteen hundred acres of land. For many years persons in the locality had been cutting timber in the valley of this stream and on the hills on either side of it. The tops of the trees were scattered along the branch and in the valley and on either side of it. Legs, full-grown trees and other timber were cut and lying loose in and

across the branch and in its valley. This state of affairs had existed for years and was known to the defendant long prior to the time Mr. Copeland was injured. The precipitous bluffs on either side of the stream caused the water to rush into it with great rapidity. An ordinary rainfall would cause it to overflow, and when it overflowed it carried great quantities of timber and driftwood and lodged it against the piling supporting the railroad bridge.

On the evening of the accident, June 26, 1897, plaintiff left Kansas City at 6:20 p. m. as conductor in charge of a regular east-bound passenger train on defendant's railroad, bound for St. Louis. The train was composed of an engine, tender and seven cars, viz., a mail car, three passenger coaches, a chair car, baggage car, and a sleeping car. It was raining some, but not very hard when the train left Kansas City.

The regular west-bound passenger train on defendant's road arrived in Kansas City that evening just before the train in charge of plaintiff left there. This train passed over Rose creek bridge at 5:43 p. m. and was on time at Missouri City, one mile east of there at 5:38 p. m. This train safely crossed over Rose creek bridge at the usual rate of speed, and at that time the water was not running in the branch underneath that structure. It was raining "just a very little bit" when this train crossed over Rose creek bridge. This train had seven passenger cars and was heavier than the train in charge of plaintiff.

An extra freight train east-bound from Kansas City to Missouri City, composed of an engine and tender and ten or twelve loaded cars and three empty cars, or fifteen cars in all, passed over Rose creek bridge in perfect safety at 6:20 that evening. It was not raining and there was very little water in Rose branch when this train crossed it. Defendant's section foreman with three men and a hand car passed over Rose creek bridge that evening at 5:45 p. m. going east to Missouri City.

There was no water in Rose branch then, "to amount to anything." It was just beginning to rain. The foreman "noticed nothing unusual as to the condition of the bridge over Rose creek."

There is, as the record shows, very little water in the branch at ordinary times.

The driftwood in time of heavy rains floated down Rose branch and lodged against the piling supporting the railroad bridge, but was removed as soon as practicable by defendant's section men. These men saw no driftwood in Rose branch on the evening of the accident when they passed over the bridge.

The bridge in question was constructed in 1890. On the east and west banks of the stream, stone abutments were constructed upon which the bridge rested. The bridge was what is known as a pile bridge with about sixty feet of waterway between the abutments. The stringers upon which the rails of the track rested were white pine, seven by sixteen, and thirty-two feet long; that is, they were sixteen inches at the top, seven inches wide, and thirty-two feet long. The joints in the stringers were broken; that is, every other one was crossed, starting with sixteen feet, then the next one would come thirty-two feet and fasten over with caps, and the next one the same way.

Underneath the bridge, supporting it, were three rows of piling sixteen feet apart, and sixteen feet from the edge of each abutment, Each row or bent contained six piles, or eighteen in all. These piles were of Missouri white oak, perfectly new in 1890, purchased along the line of defendant's railway, and were inspected at Moberly by an experienced bridge-builder before being used, and were all sound. As unloaded at the bridge, these piles were each thirty-five feet long, but were cut off to thirty feet each, so as to fit in the space under the rails. They varied from sixteen to eighteen inches in diameter, and were driven from fifteen to seventeen

Vol 175 mo—42

feet in the earth to the solid rock, where they could not be driven further. In driving these piles a steam hammer weighing 2,500 pounds was used. After the piles were driven, cross braces were put on each row or bent of six piles.

After the accident it was discovered that the west side of the pilings in the bridge was entirely gone, and the piling in the middle bent was broken square off, and the piling in the east bent broken and splintered.

Defendant's tracks cross Rose branch at right angles, at which point its bottom is solid rock or soapstone, and level or nearly so, but its covering was of made earth not evenly spread over it; the bed of dirt upon it was standing on its surface. It was higher and much more solid on the east side and gradually inclined down towards the west abutment. The main channel of the stream ran next to the west abutment and against the west row of piling.

The wagon road passing under the bridge was not a public road or one much traveled, but was a place where some neighbors passed through going to and from their work. This road, or passage-way, was between the east abutment and the east row of piling, and practically on the bank of the stream. From this wagon road the dirt gradually declined down toward the west row of piling, and the west abutment, until the earth around the west row of piling was perhaps not half so deep as the dirt beneath the wagon road, nor was it near so compact or solid because it was sandy, and the water usually standing on it percolated through it.

The west bent or row of pilings washed out entirely. It was the washing out of the west bent that caused the catastrophe. The middle bent, which was set in deeper and more solid earth, did not wash out, but broke square off. The earth in which the east row of piling was set was still deeper and more solid than the earth around the middle bent. The east bent did not wash out, and while the piles broke they did not break off square, like

the ones in the middle bent, but in breaking splintered like fairly sound timber.

Plaintiff offered much testimony tending to show that, by reason of the accumulation of drift against the bridge and the water working its way out under it, the earth under the bridge had been washed away.

As to whether the bridge was a proper or safe structure at this point, and the pilings sound or decayed and rotten, the evidence was in conflict.

Defendant's evidence showed, however, that from the time of the completion of the bridge in July, 1890, it was inspected frequently, sometimes as often as two or three times a week up to twenty-two days prior to the accident, and was found to be all right.

About one hundred feet west of defendant's bridge was a bridge erected by Clay county over Rose creek branch, sixty-six feet long, sixteen feet wide, and rested on piles eight feet long. It was about six or seven feet above the water when there was any in the branch. This bridge had been there for fifteen years prior to 1897 without washing out.

The bridge was on a curve, and the engine rounded it at a speed of about fifty miles an hour. The track and bridge were both in line, and the bridge apparently all right. The conductor saw no driftwood against the bridge. The water in the branch was about four feet below the cross ties which rested on the top of the bridge.

The engine crossed over the bridge, but the entire tender did not. The forward trucks of the tender crossed the bridge, but the rear trucks were derailed, and went down the embankment on the east side of the track. The mail car and the baggage car went down into the creek. The smoking car and one chair car followed the baggage car, but the rear chair car did not fall entirely into the stream. The sleeping car tipped partly into the creek, with the rear trucks on the west bank.

Plaintiff was sitting in the smoking car at the time, went down with it, was badly crushed and bruised, and taken out more dead than alive.

The county bridge was swept off its supports by the high water, and was afterwards found to be comparatively intact in the river bottom below defendant's bridge.

While the evidence upon behalf of defendant tends to show that the accident was the direct result of a sudden, unprecedented and extraordinary flood, there was evidence on behalf of plaintiff tending to show that the rain was not an unprecedented one, and that the branch had been as high upon one and perhaps two occasions before.

At the time the plaintiff was injured he was a fine specimen of physical and mental manhood. He was a very active man for one of his size, strong and athletic. The injury made of him a total physical wreck, so that he has since been unable to perform any labor, or to move, rest or sleep. He is now an invalid for life. He was unconscious and thought to be in a dying condition for several days after the accident. He was in the hospital for seven weeks, and it was six months before he was able to go to his home in St. Louis. His spine was injured and there was a good deal of soreness over it at the time of the trial. His abdomen and stomach were mashed, bruised and injured, being swollen and black for months. His shoulders were wrenched and the bones and ligaments broken and torn. His eyes were permanently injured. His heart was misplaced, the apex being turned upward and towards the left nearly two and a half inches. His sixth and seventh ribs were broken. His liver had been injured and at the time of the trial was not in its normal condition. His nervous system lacked tone and vitality. All these conditions were present at the time of the trial, and the medical testimony established that they affected his general health, were permanent and incurable, painful and incapaci-

tated him from any labor at the present or any future time. He has never been able to lie down in bed since his injuries; he can only lie in bed by being propped up with pillows. He can not lie on his left side.

A demurrer was interposed at the close of plaintiff's case, and overruled, and again at the close of all the evidence, and again overruled.

Over the objection and exception of defendant the court at the request of plaintiff instructed the jury as follows:

"1. The court instructs the jury that if they believe from the evidence that plaintiff was in defendant's employ as conductor of the east-bound passenger train on the 26th of June, 1897, and that said train was wrecked by the falling of defendant's bridge across Rose branch, and plaintiff was thereby injured, and the said wreck was caused by reason of the defective condition of said bridge in any of the particulars hereinafter mentioned, and that said bridge was a pile bridge, and on account of the character of the stream and the country drained by it, said bridge was not reasonably safe at that place, or that the piling that supported said bridge had become rotten, unsound or defective, or that there was not sufficient earth around some of said piling, and that from any or all of said causes, said bridge on said 26th of June, 1897, was not reasonably safe for the passage of defendant's said train over the same, and that defendant knew of the defective and unsafe condition of said bridge, or by the exercise of reasonable care and diligence could have ascertained the same before the arrival of the train upon which plaintiff was conductor, at said bridge, then the verdict must be for the plaintiff.

"2. The jury are instructed that the risks assumed by the plaintiff in accepting employment from defendant as conductor of its passenger train, were only such as were incident to said employment, and did not include any risks arising from negligence upon defend-

ant's part (if there was such negligence) in failing to use reasonable care and diligence to see that its tracks and bridges were in a reasonably safe condition.

"3.   The jury are instructed that while the defendant was not bound to provide against the effects of a storm which it could not reasonably anticipate, yet if they believe from the evidence that the bridge over Rose branch was not reasonably safe on account of its being a pile bridge, or because some of the piling had become rotten and decayed, or because there was not sufficient earth or dirt around said piling, and that the fall of the bridge was caused by its defective condition in any of the particulars aforesaid, and not by reason of the extraordinary force of the storm, then the fact that the bridge fell during said storm will not prevent a recovery in this case.

"4.   The jury are instructed that the opinions of the parties who testified as experts are merely advisory and not binding upon the jury, and the jury should accord to them such weight as they believe, from all the facts and circumstances in evidence, the same are entitled to receive.

"5.   'Ordinary care,' as used in these instructions, means such care as a reasonably prudent person would have exercised under the same circumstances.

"6.   If the jury find for the plaintiff, in estimating his damages they will take into consideration not only his age, the physical injury inflicted and the bodily pain and mental anguish endured, together with the loss of time occasioned, but also any and all such damages which it appears from the evidence will reasonably result to him from said injuries in the future."

The following instructions were given at the request of the defendant:

"1.   The court instructs the jury that if the said bridge in question was composed of such material as was used by men of ordinary care engaged in building pile bridges, and if said material was given a reasonable

inspection at the time it was put in the bridge, and found to be suitable for the use to which it was put, and if the maintenance of the bridge thereafter was given such care and inspection as would be given by men of ordinary care and prudence, and if by such inspection nothing was found to indicate that the bridge was not reasonably safe for the purpose for which it was used, then the defendant is not liable, and you will return a verdict for the defendant; and you are further instructed that what is meant by 'ordinary care' as used in these instructions, means such care as an ordinarily prudent person would exercise under the circumstances given in evidence in the case.

"3. The court instructs the jury that before the plaintiff can recover in this action he must prove to the reasonable satisfaction of the jury, by the greater weight of the evidence in the cause, that his injuries are due to the negligent conduct of the defendant, its agents or servants; that had it not been for such negligence in constructing or maintaining the bridge in question he would not have been injured; that if he has failed to so prove, your verdict will be for the defendant.

"And you are further instructed that the defendant was not bound to furnish its employees any particular kind or style of bridge over Rose branch, or other streams its railroad crosses; that defendant has discharged its full duty to plaintiff when it has constructed and maintained a bridge over Rose branch such as is in ordinary use by itself and other railroads, and reasonably safe to carry trains over it under ordinary conditions and circumstances; that defendant was not bound to anticipate unprecedented, extraordinary or unusual rainfalls, or to build such a bridge as would resist or stand against such, and if the jury believe that the bridge over Rose branch as constructed and maintained, was reasonably safe for the purpose for which

it was built in times of usual and ordinary rainfall, then plaintiff can not recover.

"4. The court instructs the jury that if you believe the bridge in question as built and maintained was reasonably safe for the passage of defendant's trains over it, under ordinary conditions, and that it was destroyed or weakened so that it was made unsafe by an unusual rainfall, and that the wreck was thereby caused, then the accident is due to causes over which the defendant had no control and for which it is not blamable, and you will return a verdict for the defendant.

"5. The court instructs the jury that the defendant is not bound to furnish any particular kind or style of bridge over Rose branch to the plaintiff, and it is in no sense an insurer of his safety; that all the law requires of the defendant towards its employees is that it shall furnish a bridge over its streams that is reasonably safe for carrying trains over them under ordinary conditions.

"6. The court instructs the jury that if you believe from the evidence that in the construction and maintenance of the said bridge, the officers, agents and servants of the defendant, in and about such work, exercised ordinary care, that is, such as is usually exercised by men of ordinary prudence under the same or similar circumstances, then defendant is not guilty of the negligence charged; and what is meant by the word negligence is the want of that degree of care that an ordinarily prudent person would have exercised under the same or similar circumstances.

"7. The court instructs the jury that one of the defenses in this case is that the wreck was caused by the act of God, that is, an extraordinary or unusual rainfall, and you are instructed that the law is that the defendant is not liable for damages or injuries resulting from an inevitable accident or the act of God; and you are instructed that if you believe from the evi-

dence in the case that the wreck in which plaintiff was injured was caused by an extraordinary or unusual rainfall, and that it would not have occurred from an ordinary rainfall, then the verdict should be for the defendant.

"8. The court instructs the jury that although you may believe from the evidence that the defendant was negligent in either or both the construction and maintenance of the said bridge over Rose branch, yet if the wreck is not due to such negligence, and would not have occurred in an ordinary rainfall, and is due to such extraordinary or unusual rainfall alone, then the defendant is not liable and you will return a verdict for the defendant.

"9. Although the jury may believe that a bridge with a single span reaching clear across Rose branch was better than a bridge with piling in the bed of the branch; and although some parts of the piling had decayed, and although some of the dirt was washed away from around the piling, and that the piling was driven in soft earth, and driftwood was allowed to accumulate against the bridge, yet if the bridge under these conditions was reasonably safe for the purposes for which it was designed, and would have been reasonably safe under ordinary conditions and in the time of ordinary rainfall, and under such conditions said train would have passed safely over said bridge, but said wreck was the result of an extraordinary or unusual rainfall, then the defendant is not liable, and you will return a verdict for the defendant.

"10. If the jury find from the evidence in this case that the fall of defendant's bridge and the wreck of its train thereby at Rose branch on the 26th day of June, 1897, was occasioned by a sudden and unusual or extraordinary rain storm then and there prevailing, which caused an unusual amount of water to accumulate in said branch and thereby wash away a bridge previously constructed by the county of Clay over an ad-

jacent highway, resulting in its being forced by said water against the supports under defendant's bridge, thereby causing said supports under defendant's bridge to give way and cause the wreck, resulting in the injuries to plaintiff here sued for, then you are instructed that the plaintiff is not entitled to recover in this action, and your verdict must be for the defendant.

"11. The court instructs the jury that you can not resort to guess, conjecture, random judgment or supposition to determine the cause of the wreck, but before plaintiff is entitled to recover he must prove by the evidence in the case that his injuries were caused by the negligence of defendant, its servants, agents or officers, and negligence is a matter that must be proven and can not be presumed, nor can it be inferred from the happening of the accident; and if the evidence in this case fails to show that the wreck in which plaintiff was injured was caused by the negligence of defendant, or if the evidence satisfies you that the wreck was caused by unusual or extraordinary rainfall, or if from the evidence you are unable to determine the cause of the wreck, or if from the evidence the probabilities are equally strong that the wreck was occasioned either by defendant's negligence or by an extraordinary or unusual rainfall, then it is your duty to return a verdict for the defendant.

"12. The court instructs the jury that you are the sole judges of the weight of the evidence and of the credibility of the witnesses, and if you believe any witness has intentionally sworn falsely to any material fact, you are at liberty to disregard the whole of the testimony of such witnesses, and in arriving at your verdict you will take into consideration not only all the evidence in the case, but all the facts and circumstances given in evidence, and in determining what weight and credibility shall be given to any witness testifying in the case, you will consider his conduct while upon the witness stand, the reasonableness or unreasonableness

of his testimony, and in cases where he is testifying as an expert, you will consider his opportunities for forming his opinions, his qualifications for giving opinions upon the subject of his testimony, his attitude toward the parties to the action, and all the other facts and circumstances given in evidence in the trial of the case.

"15. The court instructs the jury that the plaintiff is not entitled to recover for loss of time his wages as a railroad conductor of a railroad train, and you can only consider the evidence of such wages in considering the value of time lost.

"16. The court instructs the jury that if you believe that any witness in this case has sworn to a state of facts therein in the face of and in opposition to obvious physical facts or contradictory to the common knowledge or experience of men, then it is your duty to wholly disregard any such testimony.

"17. In this case the defendant has set up the act of God as a defense against any recovery by the plaintiff. By the expression 'act of God' the law means any phenomenon or action in the physical world around us (not occasioned by the intervention or interference of man) which is extraordinary or unprecedented or outside of common experience, which is irresistible in its character, and which can not be before seen or prevented, such as extraordinary or unprecedented storm of any kind, or an unprecedented overflow of water, or an earthquake, or a sudden death or the like. If, therefore, the jury find from the evidence that before the train in question approached Rose branch an extraordinary or unprecedented rainstorm or water spout passed down and across the valley of Rose branch (which defendant's servants in charge of the train did not and could not foresee), causing an extraordinary and sudden rise in the waters of said branch, which swept away the county bridge in evidence and hurled it against the piling of defendant's bridge, where the county bridge became the cause of extraordinary scour-

ing action in the waters of said branch, they being arrested in their flow by the impediment of the county bridge, by means of which the west bent of defendant's bridge was washed out and the supports of its bridge weakened, whereby the train was wrecked and plaintiff injured, then the jury must find the issues for defendant.''

The court gave the following instructions of its own motion:

"13.  The court instructs the jury that in considering the extent of the plaintiff's injuries and his physical condition, you may consider the fact that plaintiff, prior to the accident, had had rheumatism.  If you believe his subsequent ailments in whole or in part resulted therefrom, you are instructed that plaintiff was bound to use all means within his power to effect a cure of himself from the injuries received in the accident, and if he has not done so, and has neglected to properly treat himself, then he can not recover for any condition due to such neglect; and in considering the element of damages based on account of loss of time, you will consider the nature of his employment as a railroad conductor, and can not allow for loss of time sued for since the commencement of the action, to-wit, December 15, 1898, but may consider the fact, if proven, of impairment of earning capacity.

"14.  The court instructs the jury that although you may believe that the plaintiff has a displaced heart, and that his liver is not in its natural position, yet before you can consider these facts as an element of damages it must be proven to your reasonable satisfaction that these conditions were caused by the wreck, either directly or indirectly, and that the wreck is due to the negligence of the defendant, as explained in the other instructions.''

To the giving of all of said instructions, and each of them, defendant duly excepted.

The defendant then prayed the court to give the following instructions:

"13. The court instructs the jury that in considering the extent of the plaintiff's injuries and his physical condition, you will consider the fact that plaintiff, prior to the accident, had had rheumatism and other ailments; you are instructed that plaintiff was bound to use all means within his power to effect a cure of himself from the injuries received in the accident, and if he has not done so, and has neglected to properly treat himself, then he can not recover for any condition due to such neglect; and in considering the element of damages based on account of loss of time you will consider the nature of his employment as a railroad conductor, and can not allow for loss of time sued for since the commencement of the action, to-wit, December 15, 1898, but may consider the fact, if proven, of impairment of earning capacity.

"14. The court instructs the jury, that although you may believe that the plaintiff has a displaced heart, and that his liver is not in its natural position, yet before you can consider these facts as an element of damages it must be proven to your reasonable satisfaction that those conditions were caused by the wreck, and that the wreck is due to the negligence of the defendant as explained in the other instructions.

"18. The court instructs the jury that there is no evidence in this case that the bridge in question was not a suitable bridge to have been placed over Rose branch, and that a pile bridge is not a suitable structure for that point, and that there is no evidence that said bridge was made of unsound or unsuitable material for a bridge, but the evidence shows that it was built of proper material for a bridge, and if you find from the evidence that said bridge was reasonably maintained and reasonably inspected after it was built, and nothing therein was found to indicate that it was unsafe

for the purpose for which it was used, then your verdict should be for the defendant.

"19.   And you are further instructed that although you may find that sap-rot had taken place on the piles, or some of them, and that they were reduced in size on account thereof, yet if you further find that the piling in that condition was reasonably safe for the purposes of a bridge, and was reasonably supported so as to make the bridge a reasonably safe structure as a bridge, then the verdict should be for the defendant.

"20.   The court instructs the jury that under the pleadings and all the evidence in this case the plaintiff is not entitled to recover."

To the refusal of such instructions the defendant then and there duly excepted.

It was not the duty of defendant to furnish plaintiff any particular kind of bridge so that the one furnished was reasonably safe for the purposes for which it was used, nor does the petition otherwise allege. It does, however, allege that the bridge over Rose branch was a "pile bridge, when it should have been a span bridge," but then proceeds to set forth its infirmities, and the dangerous condition it was in at the time of and before the accident. The mere allegation that the bridge was a "pile bridge" without more, does not state a cause of action, but after this allegation follow averments, which, if true, show why it was not the proper kind of bridge for that place, and not reasonably safe. That it was defendant's duty to its employees in its train service to construct and maintain a reasonably safe bridge over Rose branch, and if it failed to do so, and, in consequence of such failure plaintiff, while in the discharge of his duty, was injured, that defendant is liable to him in damages for such injury there can be no question. [Cobb v. Railroad, 149 Mo. 609.]

Defendant asserts that there was no proof whatever in support of the allegation that the earth under this bridge was insufficient to support the piles, but

we are unable to give our assent to this contention. The evidence upon this feature of the case was as follows:

*E. P. Donovan,* public administrator of Clay county, on direct examination, testifying on behalf of defendant, said: "I am familiar with the bed of Rose creek; it is made of soapstone rock and limestone—in olden times I have seen Rose branch cut out there when there wasn't any water left in it and I have seen soapstone there." Again on cross-examination the same witness said: "I do not know whether there is any quicksand in the bed of Rose branch or not—I saw sand there, but whether it was quicksand or not I will not say; I have seen dirt left by the stream that would mire until it dried up; that sediment and sort of gumbo above the sand would wash out; I have seen it when there would come down a freshet and wash it out; it was washed down deep enough so you could see the hard soapstone. I have seen soapstone there in the bottom of the branch after one of these freshets; I don't remember when it was or how many times."

*H. B. Wood* testified as follows: "I think it has been described as good as I can describe it; the river sediment forms in there and washes from the hills; it washes down the dirt and it settles there and the river backs up there over it; sometimes it is a kind of sandy soil and sometimes it is black and bluish mud, and very sticky, like soft soap; it will slip out when you catch it in your hand; sometimes the river would back in there and there would be more mud than others; it would wash out after another rain; could not say how deep it is to solid rock; have been bathing down there when I could stand on solid rock or bottom, but whether it was rock or soapstone I can not say; it was perfectly solid and I could stand on it."

*A. C. Kidd* testified as follows: "The soil into which these piles were driven was soft dirt, or made dirt; the river backs up under there every year; the river leaves a sediment there; the Missouri river some

years settles as gumbo; and some years it settles as quicksand; I have seen it both; some years it is soft and some years it is pretty solid.''

*Mr. Crabtree* testified: ''I never examined the earth into which this piling was driven, only when the horses got mired in it just below the bridge, thirty or forty feet below the bridge probably; I think the character of the dirt under the bridge was something similar to that; I think the Missouri river sediment makes sand sometimes, and it is dark blue like with mud, like the same kind they took out when they put in this bridge, something about like that same kind of stuff; under the bridge at the west bent it is not very solid; it is a kind of spongy soil; could not walk very close to the edge of the water without getting into the mud six or eight inches deep.''

*Samuel Roby* testified: ''The earth into which these pilings were driven was soft mud, a kind of quicksand sediment or wash from the hills, soil washed from the uplands and backed up by the river; when the river is high it backs in; and mud, it is very soft, when the river is high and big rains come; it makes it very soft and miry. I should judge the sediment to be about eight feet, from what I know about it, from sounding it with a rod of iron. . . . I took a three-quarter rod of iron I had there to see how deep the mud was under the bridge, and it was nine feet under the railroad bridge and seven feet and something at the county bridge, until we struck something we supposed to be soapstone or rock.''

*Frank McCoy*, a witness, said: ''I suppose it was made land. It was soil from the bluffs and the Missouri river; when the river backs in there and stands awhile it leaves a sand probably a foot, or a foot and a half, and if the creek gets high and runs, it runs in mud on top of it from the bluffs; that is about the way it is formed; where it crossed the branch there is a soapstone bottom; I have seen it. . . . I never dug

down through this stream to find where solid rock was; have seen the day when there was no dirt in the river at all, when the river run along and washed it off clear and I could see the soapstone.''

*Dr. Henshaw* stated: ''I think the soil in which the piles were sunk is soil that was washed in from the hills; it has washed in there and some of the soil is sediment from the river that backed in there, and when it is muddy it leaves a sediment from the river water; I think the last time I noticed it there was a hole of water under the bridge, that is, before the wreck.''

*William McCoy* testified: ''The soil beneath the bridge is soft and quicksand, it is made of earth; on the east side it is hard sometimes, but on the west side I never saw it hard at all; on the west side it would mire anything that went in there, any kind of stock; I have seen stock in there, horses and cattle, and I have helped to get them out. There has been water under that bridge pretty nigh all the time.''

*Seth White* testified: ''All that land in the bottom is made by the Missouri river; in driving pumps you find a sort of sand or gumbo; that land is made by the deposits from the river; it is made soil, and we call it made land that is left there by the river; at times when there is plenty of water and wet it is very spongy and muddy and this gumbo comes down with the water under this bridge; I do not know just the character of it, but it is made dirt.''

*D. D. Holt,* a witness for plaintiff, testified that he was present when they built the bridge to supply the one that gave way. He testified as follows: ''I saw them when they laid the first stone; from the bottom of the creek down, I suppose it was about six feet, from the bank up to where the abutment stood, and perhaps it was a good deal more; from the bottom of the creek down to solid rock it was not very far, six feet, perhaps,

Vol 175 mo—43

from the bed of the creek; with the exception of a little mud on that five or six feet, the balance was quicksand and gravel; I saw it when they were drawing it out and shoveling it out. I saw it again some days after the wreck, and I saw it sunk at the same place; I was down there after the wreck in 1897; they were sinking and digging out the old stone and putting in a new stone abutment there; I didn't see any difference in soil I saw in 1897 and that which I saw thirty-one years ago; I saw them digging in 1897; they digged six feet from the bottom of the creek before they struck solid rock; they struck quicksand directly they started; when they stopped they struck rock; from the bottom of the creek down to where they stopped was nothing but quicksand; I saw it when they drew it out by the tubsfull.''

It is clear from these excerpts from the evidence that there was some evidence tending to show that the earth under the bridge was insufficient to support the piles; its weight was of course for the consideration of the jury.

The bridge was constructed out of first-class material, but there was evidence tending to show at the time of the accident some of the piling was decayed, and not of sufficient strength to withstand the pressure of the water and driftwood which came in contact with it. And while the fact that the bridge went down under the train did not of itself make out a prima facie case in plaintiff's favor (Bowen v. Railroad, 95 Mo. 274), and, it was incumbent on him to show how and why the accident occurred, the falling of the bridge was one of the incidents which occasioned the injury, so that the case does not stand alone on the fact that the bridge fell and that the plaintiff was injured, but if in connection therewith the evidence showed that the bridge was a pile bridge and on account of the character of the stream and the country drained by it such a bridge at that locality was not reasonably safe, or, that the piling that supported it had become rotten, unsound and de-

Copeland v. Wabash Ry. Co.

fective, and therefore not reasonably safe, or, that there was not sufficient earth around some of said pilings, and, for that reason the bridge was not reasonably safe, or for any or all of these reasons it fell, and injured plaintiff, and that defendant knew of the unsafe condition of said bridge, or by the exercise of reasonable care and diligence could have ascertained the same before the arrival of the train upon which plaintiff was conductor at said bridge, he made out a prima facie case entitling him to go to the jury, and it then devolved upon defendant to overcome this prima facie case, and to show by the weight of the evidence to the satisfaction of the jury, that the accident was attributable to some other cause, and this defendant undertook to do by showing that a sudden, unforeseen, unprecedented and extraordinary storm, flood and water spout, purely local in its character, occurred in the immediate vicinity of Rose branch, only a few brief minutes prior to the arrival of that train at that point, which swept the county bridge against this structure and wrecked it, hence, the accident was the result of *vis major,* or an act of God, for which the defendant is not liable. But the evidence upon this point was not all one way, and while it tended to show that the rise in Rose branch was occasioned by an unprecedented rainfall, there was evidence to the contrary, to such an extent that the court would not have been justified in taking the case from the jury upon that ground. Besides, defendant's assertion that the high water in the branch washed the county bridge from its location and swept it against the railroad bridge and wrecked it, is merely conjectural, as there was no evidence to that effect.

It is said for defendant that by the first and third instructions given at the plaintiff's request the jury were expressly authorized to find a verdict in plaintiff's favor if the bridge was a pile bridge. This we think a misinterpretation of these instructions, and that by no fair construction can they be construed as telling the

jury that they were authorized to find a verdict in plaintiff's favor simply because the bridge in question was a pile bridge. They simply told the jury that defendant was bound to maintain a reasonably safe bridge, and submitted to them for their determination from the evidence whether such a bridge over Rose branch, in view of the area of country drained by it and the character of the stream, was reasonably safe. It would have been difficult to have presented this feature of the case to the jury in more apt words than were employed in that respect, to-wit, "And that said bridge was a pile bridge, and on account of the character of the stream and the country drained by it, said bridge was not reasonably safe at that place." Now, if the instruction had presented the case to the jury upon the ground alone that the bridge was a pile bridge without more, defendant's contention would clearly be correct, but it went further and in connection with the fact that the bridge was a pile bridge submitted it to the jury to say whether on account of the character of the stream, and the country drained by it, such a bridge was reasonably safe at that location.

So with respect to the third instruction. It left to the jury for their determination the question whether a pile bridge was reasonably safe over Rose branch at the place of the accident, under all the facts and circumstances in evidence. The entire instruction should be considered together, and not from certain parts, or words taken from it, and when this is done it is not in any way open to the objection urged against it.

Nor is there any conflict between plaintiff's instructions and the third and fifth given in behalf of defendant. They are framed when taken together to cover certain features of the case: plaintiff's, that defendant was bound to furnish him a reasonably safe bridge over Rose branch, though of no particular kind or style; while by defendant's, the jury were told that defendant was not an insurer of plaintiff's safety, and was only

required to furnish a bridge that was reasonably safe for carrying trains under ordinary conditions. The conflict between these instructions, and plaintiff's, to the effect that, if on account of the character of the stream and the topography of the country drained by it, a pile bridge was not reasonably safe, then defendant had performed its duty to plaintiff, and, if the injury resulted from such negligence, he was entitled to recover, is not apparent, nor do we think there is any. They merely presented diverse views of the respective parties with respect to the duty of the defendant to the plaintiff, and are not at all inconsistent or inharmonious. Upon the part of defendant the jury were told that no particular kind or style of bridge was necessary, but that defendant's duty was performed when a reasonably safe bridge was constructed.

For the plaintiff the jury were told that it was the duty of defendant to provide and maintain a reasonably safe bridge, and if on account of the stream and the country drained by it, a pile bridge was not reasonably safe at that place, etc., the defendant was negligent. Clearly there is no inconsistency, or conflict in these instructions.

Another contention is that the thirteenth and fourteenth instructions asked by defendant and modified by the court, should have been given as asked. There is no merit in this contention. The first-named instruction as asked directed the jury, in passing upon the extent of plaintiff's injuries and his physical condition, to consider the fact that prior to the accident he had rheumatism and other ailments, when as amended it told the jury that they might consider the fact that plaintiff had rheumatism prior to the accident if they believed his subsequent ailments, in whole or in part, resulted therefrom. Clearly, unless plaintiff's rheumatic troubles have some connection with the injuries, there was no reason why they should be considered by the jury in making up their verdict.

The fourteenth instruction was amended so as to authorize the jury to take into consideration any physical injuries to plaintiff resulting directly or indirectly from the accident. That the instruction as amended correctly presented the law on this phase of the case to the jury is beyond any question.

No error was committed in refusing the eighteenth and nineteenth instructions asked by defendant, as those that were given covered fully every phase of the case.

Defendant asserts that illegitimate and improper means were resorted to by one of plaintiff's counsel, to prejudice the jury against the defendant, outside of the courtroom, in that a false and misleading account of the first trial (there having been one before this) was furnished to the Mexico newspapers by him, and thereafter published during the progress of the trial here under review; that such newspapers containing the articles above described were read by the jury, or by certain members of it, during the trial. While this point is made in the motion for new trial, on the hearing of that motion, there was no evidence adduced showing that the jury ever read these statements in the Ledger and Intelligencer, the papers in which they were published, and therefore they were not hurtful to defendant. Nor does the mere fact that P. H. Cullen, one of plaintiff's attorneys, gave out these interviews to the reporters of the papers named, prove or tend to prove, that he procured such statements to be published and thereafter caused them to be distributed in Mexico to the end that they might be read by the jurors, for the purpose of prejudicing the jury against the defendant.

The trial began on Monday, February 19, and continued until after noon of the 23d, when the jury were sent to their room to consider of their verdict. After their supper that evening they were sent back to their room where they remained until about ten o'clock, when they reported to the court that they were unable to agree, and were discharged until morning. One of the

jurors by the name of Crum in the meantime procured a copy of the Mexico Message, cut from it the article which had been published a few days before concerning the Copeland case, read it over, and showed it that night to another member of the jury with whom he was rooming. This is also one of the errors assigned in this case. The article is as follows:

### THE COPELAND CASE.

---

#### AGAIN ON TRIAL IN THE AUDRAIN CIRCUIT COURT.

---

G. C. Copeland is suing the Wabash railroad for $35,000 for injuries received in the wreck at Missouri City, June, 1897, where eight men were killed. A coffin was bought for Copeland, but he recovered. The trial last term of court resulted in a hung jury. One of the jurors was for nothing, and hung to the last, while one of the others was for $20,000, two for $15,000, and eight for $10,000.

There is much interest in the case. Every point of ground will be contested. The trial may last a week.'

There is nothing said or intimated in this article with respect to the right of plaintiff to recover. It does not undertake to espouse his cause, or to attribute his injury to the fault or negligence of defendant, but simply gives an impartial statement of how the jury stood upon the former trial and a few facts connected with the accident; and does the fact that pending the trial some of the jurors read the article, furnish a sufficient reason for interference by this court, and for a reversal of the judgment upon that ground? We think not.

The matters stated in the article, even if they had been published in either of the papers and read by the jurors before they were selected to try the case, would not have disqualified them, and certainly the reading of the article thereafter and while serving as jurors would not of itself be sufficient cause for setting aside the verdict by the trial court, or for a reversal of the judgment by this court upon that ground.

The same question was before the Supreme Court
of Michigan in the case of Sherwood v. Railroad, 88
Mich. 108, in which it is said:

"After the trial had been in progress a day some
newspapers published and circulated in Grand Rapids,
where the trial was in progress, published an item in
regard to the former trial, in which was stated the
amount of the verdict. It was shown that some of these
articles reached some of the jury. Defendants there-
upon requested the court to permit an inquiry to be
made to the jury, and ascertain whether they had read
these articles, and if they had to arrest the progress of
the trial of the case and grant a new trial. The applica-
tion was overruled. Defendant's counsel insist that this
was prejudicial, and especially in view of the fact that a
verdict in the present case was larger than in the
former. This rule, if established, would render in-
competent every juror who knew the amount of the
former verdict. Intelligent men, who are the most com-
petent jurors, are usually readers of newspapers.
Newspapers have the right to publish verdicts and
judgments rendered in the courts. The result would
be to render incompetent as jurors in many cases nearly
all the intelligent residents of the county. It, of course,
makes no difference when the jurors learn the amount
of the former verdict. It is, indeed, desirable that such
things, so far as possible, should be kept from the
knowledge of the jury; but, however unwise it may be
to publish them at the time of the trial, no violation of
law is committed in so doing, nor will the reading of
them by jurors render them incompetent."

In Harriman v. Wilkins, 20 Me. 93, it was decided
that, where a jury found among the papers, without
any fraud on the part of the successful party, the ver-
dict rendered upon a former trial, this constituted no
ground for vacating their verdict.

In 2 Thompson on Trials, sec. 2576, it is said: "The
mere fact that the verdict in a former trial gets acci-

dentally into the hands of the jury with the papers, held no ground for a new trial,'' etc.

Fuller v. Fletcher, 44 Fed. 34, was an ejectment suit. It had been tried five times. Verdicts for the defendant at the first and the plaintiff at the second trials were set aside by the United States Circuit Court. A verdict returned for plaintiff at the third trial was set aside by the United States Supreme Court on writ of error (Fletcher v. Fuller, 120 U. S. 534). The fourth trial resulted in a hung jury. On the fifth, the defendants obtained a verdict and plaintiff moved to have the same set aside because the jury had read the opinion of the Supreme Court in 120 U. S. 534, which opinion as read by them was published by defendants in pamphlet form and by them generally distributed. The copy of the opinion which the jury read will be found in 120 U. S. 534, and said opinion contains a full statement of the evidence at the former trial, including a map of the disputed land in reduced size; also a statement of the finding of the jury for plaintiffs, and the opinion of the Supreme Court of about twelve pages, stating the evidence and discussing the weight of the evidence and the conclusion of the court that a verdict for the plaintiff was not authorized. The verdict for defendants on the fifth trial was challenged by plaintiff for the reason that the jurors had read the opinion of the Supreme Court above referred to. In overruling the motion for a new trial on these grounds the court said:

''The depositions taken by a commissioner, appointed by the court with the consent of the parties, prove this state of facts: one of the defendants, before the last trial, caused to be printed one hundred pamphlet copies of the opinion of the Supreme Court as reported in Fletcher v. Fuller, 120 U. S. 537-555, and distributed them among friends and relatives interested in the case, and among other persons in the neighborhood, including some who had been jurors or witnesses at former trials. Pending this trial the foreman and

another of the jury each read one of those copies, brought to his notice under the following circumstances: a copy was left, by whom it did not appear, at the place of business of the foreman in Providence. Goodling, the town clerk of Lincoln, and who held other lands under the same title as the defendants, testified that two days before the last trial he called at the residence in Lincoln of another juror drawn and attending at the term, and afterwards sworn as a juror in this case, and gave him a copy, for the purpose of enabling him to understand the case better, and with no intent to influence his judgment. Goodling's conduct, though meddlesome and foolish, does not appear to have been dictated by a corrupt intent to interfere with the administration of justice, and there is not the slightest evidence that either of the defendants had a hand in it. On the contrary, it is clearly proved by the uncontradicted testimony of the defendants that none of them had anything to do with transmitting or delivering such copies to either of those jurors, or to any other juror who sat at this trial; and it is also proved by the testimony of both of those jurors that no such copy was taken into the jury room or laid before the jury. In order to set aside a verdict because a paper was unlawfully communicated to the jury, it must, at least, appear either that the party in whose favor the verdict was afterwards returned took some part in the communication, or that the paper was such as could be supposed to have influenced the minds of the jury. The copies in question having been communicated to the two jurors out of court, and without any participation of the defendants, the case stands just as if those jurors had happened, on the way to or from the court during the trial, to read the opinion in a newspaper, or in the official reports of the Supreme Court; and there is no such presumption that they could have been unduly influenced by their separate reading of that opinion as will justify the setting aside of the verdict subsequently returned by the jury, after being fully in-

structed by the court upon the law applicable to the case. [U. S. v. Reid, 12 Howard 361, 366.]''

The case of Kerr v. Lunsford, 31 W. Va. 659, is also in point. In that case the court said:

''The motion for a new trial was also based upon an affidavit that the Wheeling Intelligencer, a daily newspaper published in the city of Wheeling, had the following paragraph published therein during the trial: 'The Lunsford will case still drags its slow length along. It will probably occupy the entire remainder of the week. The general public opinion is that the jury will sustain the will or disagree. Among the witnesses examined yesterday were Rev. Dr. Cunningham, Attorney-General Caldwell, Hon. Daniel Lamb, and John O. Pendleton.' 'An affiant further says that said daily newspaper has a large circulation in and through said city, and is very generally read by the people of said city, as he believes.' Here is no evidence that any member of the jury read said paragraph, and, if they had, that would not be sufficient to set aside the verdict. If the fact was as therein stated as to the 'public opinion' on the case, the members of the jury, who are not required to be and were not, kept together, could have heard the matter talked of without themselves being culpable. If verdicts could be set aside on such grounds, suits would be interminable. The court did not err in refusing to set aside the verdict on this ground.'' To the same effect is U. S. v. Reid, 12 Howard 361.

It is said in 12 Ency. Pl. and Pr., 622: ''And even where the jurors received newspapers containing accounts of or comments upon the case, a new trial will not be granted if there was nothing calculated to mislead or improperly affect their minds, or to prejudice their verdict.''

As we are unable to see how or in what way defendant could have been prejudiced, or the jury influenced.

by reading this article, we are not inclined to think the judgment should be reversed upon that ground.

While the excessiveness of the verdict is assigned for ground for a new trial in the motion filed for that purpose, it is not urged, in the briefs filed by counsel for defendant, upon the attention of this court. But in any event no one can read the evidence in this case with respect to plaintiff's physical condition before the accident, and since, the extent of his injuries and their permanency, the suffering that he has undergone, and will have to endure during his life, his incapacity to work or labor, and entertain for a moment the idea that the sum awarded him was at all excessive.

Our conclusion is that there was ample evidence to take the case to the jury, upon all the issues, and as its weight was for their consideration, and not ours, we should not interfere upon that ground.

Finding no reversible error in the record, we affirm the judgment. All of this Division concur.