LOLA G. POWELL, RESPONDENT, v. EMMET V. BROSNAHAN ET AL., DEFENDANTS, HORTENSE BROSNAHAN, APPELLANT.—115 S. W. (2d) 140.

Kansas City Court of Appeals. March 7, 1938.

 

*Trusty & Pugh* and *C. W. Terry* for respondent.

*Guy W. Green, Jr.,* of counsel for respondent.

*Harding, Murphy & Tucker, John T. Harding, David A. Murphy, R. Carter Tucker* and *John Murphy* for appellant.

BLAND, J.—This is an action under the wrongful death statute. There was a verdict and judgment in favor of the plaintiff in the sum of $6500. Defendant has appealed

The facts show that plaintiff is the wife of James E. Powell, who met his death on the 7th day of November, 1934, as a result of having been run into by an automobile which was being backed out of her private driveway by the defendant at her residence in Kansas City. No one saw the automobile strike deceased. What happened at the time was established, solely, by defendant's personal testimony.

The driveway in question ran east and west. It extended from the rear of the property, where was situated the garage to the west, eastward to the street for a distance of somewhat more than 100 feet. North of the driveway was situated defendant's house. The driveway was about 9½ feet in width. It was of solid single track construction and composed of concrete for its entire width and length. On the north side of the driveway there was a retaining wall, which began at a point about even with the front porch of defendant's residence. It ran east to approximately the sidewalk line and at its west end the wall was about six inches high and, as it extended east, its height increased until it reached a maximum height, a few feet west of the west edge of the sidewalk, of about twenty-one inches. On the south side of the driveway was another retaining wall, identical in character and construction, except it extended westwardly as

far back as the garage. The driveway sloped downward from the west to the east, beginning with about the outer edge of the front porch of the house and toward the sidewalk. At the time of the casualty the automobile was standing in front of the garage with its rear end approximately 100 feet from the sidewalk.

While being backed by the defendant the automobile struck a cart or a wheel barrow, which deceased was pushing up ·the driveway. The collision took place at a point about thirty-two to forty-two feet west of the sidewalk. The rear end of the automobile, it may be inferred from the evidence, struck the front of the cart. Deceased was knocked unconscious and died in a few hours afterwards.

The cart was about four and one-half feet wide, five feet long, with two handles on the rear and an iron wheel on each side near the front. The wheels were about twelve inches in diameter and the rims were about four or five inches wide. They were far enough apart to run on a ribbon driveway. There was a frame in front to keep the trash from falling from the cart when the handles were lifted up. The top of the frame was about three and one-half feet from the platform of the car and about five feet from the ground. This frame was composed of two uprights on each side of the cart to which were nailed slats about five or six inches wide. The slats ran across the front and between the uprights. The space between each slat was about four or five inches. The cart weighed in the neighborhood of 250 pounds. The car was moved by pushing forward on the handles. It was "almost impossible to pull it." In moving it up grade it was necessary to lean over and push on the handles of the cart and, when it was being moved, the wheels made enough noise to be heard a block away.

Defendant and her husband were members of the Wornall Homestead Association. This association, among other things, collected and disposed of rubbish for its members. The association employed agents to do this work. Among the agents was one, Joe DeVault, for whom deceased worked. Apparently trash had been collected customarily from the rear of defendant's premises by means of the cart in question or a similar one. At least for sometime prior to the collision the cartman used the driveway for the purpose of making the collections. There was evidence that the driveway was used also by deliverymen in making deliveries to the rear of the house. (Although this was denied by the defendant.) The driveway was the only means of reaching the rear of the premises except by going through the house. In coming up the driveway the trashman would push the cart ahead of him in the usual manner.

Defendant testified that a short time prior to one P. M. of the day of the casualty she was preparing to take her small daughter to school, which was about twenty blocks distant from the house; that she had only five minutes to get there; that she left her house by the rear

door and entered the car which was on the driveway; that the car at that time was about five or six feet east of the garage facing it; that just before entering the car she looked down the driveway to the east and observed that the latter was clear all of the way to the street; that there was no one on it or approaching it; that she entered the car and started the motor; that she exchanged greetings with her next door neighbor to the south who was on her back porch; that she then sounded the horn on the car for her little girl who was in the house; that she then talked to her neighbor for a few minutes, after which she again sounded the horn; that following this the little girl immediately came out of the house and got into the car; that the witness then looked at the rear vision mirror of the car and thus obtained a view of the driveway behind her; that at that time she had a plain view of the driveway to the east and she saw that the driveway was clear; and there was nothing on it; that she then started backing the car down the driveway, slowly; that, at the same time, she put her head out of the window on the left-hand, or the driver's side of the car, and looked along the retaining wall to the south of said driveway; that from that position she could see the retaining wall on the south side of the car and a portion of the south side of the driveway east as far as the street; that as the car proceeded backward nothing thereafter came on or into the driveway within her vision; that when her car had traversed about half the length of the driveway and when the rear end of it had reached a point toward the east about even with the steps of the small sidewalk in front of the house, which lead from the driveway to the front porch, she heard a noise or crash to the rear of the car; that she immediately stopped the car; that she traversed about two feet from the time she heard the noise until she stopped; that after the car had stopped she told her little gril, who was seated in the front seat beside her, to get up and look out the rear window and see what had happened; that the little girl advised her that a man was lying on the sidewalk back of the car; that the witness then got out of the car and walked around to the rear where, for the first time, she observed deceased, who was laying on the north side of the driveway eight or ten feet east of the rear of the car; that the trash cart was located at the foot of the driveway and on the north side thereof with its front end pointed west up to the driveway. It was agreed that deceased's position in the driveway after the collision was from twenty-two to thirty feet west of the sidewalk.

Certain portions of defendant's deposition were read in which she testified that cleanup day was on Wednesday of each month; that the accident occurred on Wednesday; that she had seen trashmen coming on the premises on former occasions; that they came from the south and turned up th edriveway.

At the trial she testified that on the day in question she had seen a

trashman eating lunch somewhere nearby and knew that he would be in to collect the trash; that she was expecting the trashman to come that day and get her trash; that immediately after the crash it flashed in her mind that it might be the trashman or the little automobile which the child next door played with, with which she had collided; that the reason it flashed through her mind that it might be the trashman was that she was expecting one; that when the car struck the cart she was not coasting but using power, backing out of the driveway slowly; that she had become a little impatient over waiting for her little girl because the witness had only five minutes to get her to school but she was not rushing at the time. "I was backing slowly."

At one place in her testimony defendant stated that, after she saw the trashman down the street eating his lunch on the curb, she did not give him any more thought until after the accident; that she was not expecting anyone on the driveway.

In her deposition, taken before the trial, she testified that she came out of the house and got into her car; that her daughter remained in the house; that she gave a couple of blasts of the horn to call her daughter; that she waited approximately five minutes until the daughter came out; that the witness became a little impatient in waiting; that she gave some blasts of the horn to get her daughter into the car and gave none after that; that deceased after the collision was lying with his head toward the foot of the driveway, his feet toward the car; that there was no fog or rain that day and that the rear vision mirror and the rear window of the car were clean.

At the trial the defendant admitted that her statements made concerning the times when the horn was blown, that is, that she gave some blasts of the horn to get her daughter into the car, and didn't give any other blasts of the horn, were true and correct. She testified that if she had looked back through the rear vision glass and deceased had been on the driveway he would have been visible and she could have stopped the car within two feet. She testified that she sounded the horn on two occasions, one when she got into the car; that she waited two or three minutes and sounded the horn again; that immediately thereafter her daughter came out of the house and got into the car.

It is insisted that the court erred in refusing to give defendant's instruction in the nature of a demurrer to the evidence. It is admitted by the defendant that the relationship between deceased and her was that of business invitee. [See Restatement of the Law of Torts by the American Law Institute, Sec. 332, p. 897.]

It is well settled that the duty owed the occupier of premises toward a business invitee is that of exercising ordinary care for his safety. [45 C. J., pp. 823, 824; Glaser v. Rothschild, 221 Mo. 180; Watson v. Sylva Tanning Co., 192 N. C. 790.] This includes one who comes

upon the premises to work thereon and while he is performing such work. [Adams v. Barrwll, 125 Me. 164, 166.]

Defendant insists that, under the facts in this case, there was no duty on the part of the defendant to have maintained a lookout or sounded a warning, for the reason that the evidence shows that she had no grounds to anticipate the presence of anyone on the driveway and that, even if she were required to keep a lookout or sound a warning, that duty was discharged in this instance; that when she looked through the rear vision mirror neither deceased nor his cart were upon the driveway or in view; that in looking out of the side window of the car it was impossible for her to have seen deceased and his cart as they proceeded up the driveway, if they did.

We are of the opinion that the facts in this case, taken in their most favorable light to the plaintiff, show that there was a duty on the part of the defendant to have kept a lookout and that if she did look that she looked negligently. The facts, taken in their most favorable light to plaintiff, show that defendant had made arrangements for the trash to be collected at the rear of her house; that it was necessary for the collector of the trash to wheel the cart over the driveway in order to reach the trash; that it was customary for the trashman to use the driveway and that they used it with the knowledge and consent of the defendant and that she was anticipating the trashman at the very time she backed out of the driveway.

While the testimony of defendant shows that deceased was not upon the driveway at the time the defendant started backing her car, there were sufficient facts from which the jury could draw a reasonable inference to the contrary. At the time the car was stopped deceased was lying twenty-two to thirty feet west of the sidewalk. The rear of the car was stopped eight or ten feet west of deceased. It took one or two feet to stop the car. Defendant testified that she was driving slowly but that she was not coasting. The word "slowly" is a relative term. What would be a slow speed under one set of circumstances might not be under another. She did not attempt to state the miles per hour she was moving. She did testify that she was impatient while waiting for her daughter; that she had only five minutes to go twenty blocks in taking her daughter to school. The circumstantial evidence shows, beyond any question, that the car either struck the cart at a point 32 to 42 feet from the sidewalk and drove it down hill or struck deceased at that place and knocked him several feet. This is evidence that the automobile had attained some speed. The evidence shows that the cart was a heavy one and required a man pushing it up an incline to lean forward. It is a fair inference that the cart was going at a slower rate of speed than the automobile and that it was proceeding up the driveway at the time the automobile was started back.

The physical facts would indicate that deceased had been pushing

the cart ahead of him up the driveway and that the rear, of the automobile struck the front end of the cart causing the latter to knock deceased down and run over him and proceed on down the incline toward the street. It may be inferred from the evidence that it was the cart that defendant's car struck and, as before stated, the collision took place thirty-two to forty-two feet west of the sidewalk. Consequently, at the time of the collision, defendant had driven her car fifty-eight to sixty-eight feet with power. The cart was equipped with heavy iron wheels making considerable noise. It was almost as wide as the automobile.

We think there was sufficient evidence from which the jury could conclude that the cart was present and starting up or about to start up the driveway at the time the defendant said she looked by the use of the rear vision mirror. But, even if that were not true, the jury could have arrived at the conclusion that if she had been looking with due care, she could have seen the cart proceeding up the driveway when she looked out the window along the side of the car. She could have stopped within two feet. In addition to this, it was within the province of the jury to say that, having anticipated that a trashman would be coming up the driveway about this time, she should have again looked by means of the rear vision mirror as she started backing out the driveway and before striking deceased. We think there was sufficient evidence for the consideration of the jury as to the negligence of the defendant.

However, defendant insists that deceased was guilty of contributory negligence, as a matter of law, and that no case was made under the humanitarian rule. The cause was submitted by the plaintiff, solely, under that rule.

It is necessary for us to pass upon the question as to whether deceased was guilty of contributory negligence as a matter of law if the case is one for the application of the humanitarian doctrine. Defendant discusses this point together with the point that there was error in the instruction on which the case was submitted by the plaintiff and we will approach the subject in the same way. The instruction complained of reads as follows:

"If you find from the evidence that on the occasion the deceased, James E. Powell, was injured he was going up the driveway as a trashman and was taking his cart up the driveway for such purpose, and that arrangements had been made for trashmen to go upon the premises of defendant to get trash, and that it was customary for the trashmen to so use the driveway, and that they had so used said driveway with the knowledge of the defendant, and to collect the trash for defendant, and if you so find,

"(2) Then you are instructed by the Court that, on the occasion in question, the deceased, while such arrangements for the trashmen

existed and while he was on the driveway for such purpose had the right to use said driveway on said occasion, and so

"(3) If you find from the evidence the facts and situation and conditions to be as referred to in and required by Paragraph number one of this instruction then you are instructed by the Court that it was the duty of Mrs. Brosnahan when backing her automobile over the driveway on the occasion in question to exercise ordinary care to discover and avoid injury to such persons as might likely be using said driveway and in peril of injury and to give reasonable warning of peril to such persons in a reasonable effort to avoid such injury; and so

"(4) If you find from the evidence that the automobile was being backed eastward at the time the deceased was going up said incline, and that while he was so going up said incline a position and situation of imminent peril was arising and did arise, and that he would be injured by said automobile unless it was stopped, or unless reasonable and timely warning was given him, and that he was unaware of his danger until it was too late for him to escape therefrom; and

"(5) If you further find from the evidence that the defendant, by exercising ordinary care, could have known that such position of imminent peril to the deceased was arising and did so arise and that he would likely be injured by said automobile unless it was stopped, or unless reasonable and timely warning was given him, and if you further find from the evidence that by exercising such ordinary care the defendant could have known of such imminent peril and danger to deceased in time by the exercise of ordinary care in the use of the means at her command, and with reasonable safety to the automobile and all persons therein, to have thereafter stopped said automobile, and that she failed to do so, and that by so stopping the automobile the injury would have been avoided, or by such lookout could have discovered such peril in time, by the exercise of such care in the use of the means at her command and with reasonable safety to herself and child, to have thereafter given the deceased reasonable and timely warning, and that such reasonable and timely warning would have avoided the injuries to the plaintiff's husband and his death; and if from the evidence you so find such to be the facts, and then

"(6) If you further find for the evidence that the defendant failed to exercise such ordinary care and failed to give such reasonable and timely warning or to so stop said automobile, then you are instructed that she was guilty of negligence, and if you further find from the evidence that such negligence of said defendant, if you find she was so negligent, either directly and solely caused the injuries and death of James E. Powell, or directly concurred or directly combined with any act or omission of said James E. Powell, if you find from the evidence there was any on his part, in bringing

about the collision, and that it caused the death of said James E. Powell, then you must return a verdict in favor of plaintiff, Mrs. Lola G. Powell, and against the defendant, Mrs. Hortense Brosnahan.''

It is insisted that the instruction is erroneous for the reason that this case is not one for the application of discoverable peril; that defendant's liability, if any, would be upon discovered peril only and that an action based upon discovered peril would be one upon primary, and not humanitarian negligence. In this connection defendant states that, in order for there to have been a duty imposed upon defendant to keep a continuous lookout at the time and place in question, there must have been such user of the place of the accident by the public, or by persons invited to come to the place, as to have constituted the location either a public place or such as might be said to have been in the nature of a public place; that there is no evidence that the driveway in question was in its nature of, or actually, a public place and consequently this case involves the duty, if any, to maintain a lookout under the circumstances or conditions of a particular occasion. In this connection defendant relies strongly upon the case of Mayfield v. K. C. So. Ry. Co., 85 S. W. (2d) 116.

That case involved the transfer of freight cars through railroad yards. The plaintiff contended that, in view of the fact that defendant violated a custom to have a lighted lantern on the lead car so that railroad employees in the yards (deceased being in that class) could see the car coming, it should have kept a lookout for such employees. It was held that if there was such a duty to keep a lookout it would not afford a ground for a humanitarian case because such duty arose out of the circumstances of that particular occasion. The court said, 1. c. 124, 125, that the humanitarian rule cannot be made to apply ''to discoverable peril, merely by showing circumstances from which there would arise a duty to be on the lookout at that particular time or on that particular moment only.'' In other words, it was held that the fact that defendant violated a given duty on a particular occasion would not give rise to a discoverable peril humanitarian case based upon the creation of some other duty by reason of the violation of the given duty, for that would make a humanitarian case out of facts based on a particular occasion.

The facts in the case at bar are not like those in the Mayfield case. Here there was a general duty, not based upon the violation of another duty on a particular occasion, to keep a lookout for all business invitees likely to be upon the driveway. It is true that, in the Mayfield case, the court arguendo used some rather broad language in reference to the circumstances under which the rule of discoverable peril applies, saying that the places where there is a duty to keep a lookout, extending the humanitarian rule to discoverable peril as well as discovered peril, are either public places, or in the nature of

public places because they are frequented and used by many people. [l. c. 123.]

The language used in the opinion is well enough in relation to the facts in that case for under the particular circumstances surrounding the operation of a railroad it is necessary to have a clear track, except at public crossings or public places, and railroad employees assumes the risk of being struck at other places unless they look out for their own safety, in the absence of a custom to the contrary. However, the duty to keep a lookout so as to discover persons likely to be injured extending the humanitarian rule to discoverable as well as discovered peril is not always confined to public places. It is so shown from what was said in one of the cases cited by defendant. [Hines v. Bridges Asphalt Paving Co., 55 S. W. (3d) 431.]

In that case a traffic officer was run over by a steam roller being used in paving a street. The street where the traffic officer was stationed and run over, had been withdrawn by the city from public use, yet, the court held that it depended upon the circumstances existing at the time as to whether or not the humanitarian rule applied. It was said in that case, l. c. 433, 434: "The withdrawal of the street from public use may have effected a release of the city from liability, but it did not necessarily guage the duty of appellant. The real question is whether under the facts and circumstances existing at the time of which the operator must necessarily have been cognizant he could reasonably have assumed that the street where he was operating the roller would at all times be clear of persons or vehicles, or was he bound to anticipate that they might come, or be, upon the street in such proximity to his movements as to be endangered thereby." That the humanitarian rule applies in this case, we have no doubt. [See Restatement of the Law of Torts, Am. Law Institute, Section 479, pp. 1253.] By sub-division (d), section 479, p. 1255, it is indicated that even a trespasser on private property, under some circumstances, may be protected by the humanitarian rule. We are, therefore, of the opinion that the instruction is not erroneous as submitting discoverable as well as discovered peril.

We have examined the other cases cited by the defendant and find them not in point. Most of them are cases involving antecedent negligence, which, of course, has no place under the humanitarian rule. No antecedent negligence was submitted in the instruction.

However, it is insisted that the instruction does not submit facts which the law requires in order that there be a duty to keep a lookout. The instruction first has the jury find that arrangements had been made for the trashmen to go upon the premises of the defendant; that it was customary for them to use the driveway; that they used it with the consent of the defendant. Of course, if the jury found these facts, then deceased was a business invitee and, being such, it became the duty of the defendant to exercise ordinary care toward

him. In fact there is no dispute but that deceased was a business invitee. The instruction then goes on to tell the jury that, in backing the car over the driveway, it was defendant's duty to exercise ordinary care to discover and avoid injury to such persons as might likely be using it. If defendant knew, or should have known, that deceased, or someone in his class, was likely to be using the driveway at the time in question, then it was her duty to use ordinary care to keep a lookout for him. [Czarnetzky v. Booth, 246 S. W. 574.] The instruction does not require the jury to find that deceased, or someone in his class, was likely to be using the driveway under the circumstances, but under the evidence, such a finding was unnecessary, as the defendant, herself, was expecting a trashman at the time she backed up her car. While at one place in her testimony she testified to the contrary, her admission that she was expecting a trashman, not having been explained in any way, was conclusive against her on that point. [Steele v. Kansas City So. Ry. Co., 265 Mo. 97.]

We have examined the cases cited by defendant and find them not in point. In Haines v. Bridges Asphalt Paving Co., *supra,* the jury was not required to find any facts giving rise to a duty owing by the operator of the steam roller to the plaintiff. As before indicated, this is not true as to deceased under the instruction in the case at bar.

It is insisted that there is no evidence from which the jury could find that deceased did not discover his position of peril until too late for him to escape, as submitted by the instruction. As before stated, there was evidence from which the jury could conclude that deceased, or his cart, was upon the driveway, or entering the same, at the time defendant started backing up the automobile and that defendant did not see deceased either because she failed to look or, if she did look, the act was negligently done.

There was no contention at the trial of this case that deceased wantonly or wilfully placed himself in a position of danger. Neither did defendant contend that deceased was seen by her in a position indicating that he was not going to get upon the driveway back of the car, or, being in its way, was going to get out of its way and escape danger. Under such circumstances obliviousness to peril was not an issue and that feature could have well been left out of the instruction. "The function that 'obliviousness to peril' plays in last chance cases is to show that the injured party did not purposely or wantonly expose himself to danger, and also to inform the operator of the car, or other dangerous agency, that the other party is going into danger, or, if already in, that he is not going to get out of it, and that therefore the operator must act to avoid the injury." [Bybee v. Dunham, 189 S. W. 190, 193; Heryford v. Spitcaufsky, 200 S. W. 123, 125, 126; Aqua Construction Co. v. United, Ry. Co. of St.

Louis, 203 S. W. 479; Dunn v. K. C. Rys. Co., 204 S. W. 592, 593; Lilly v. K. C. Rys. Co., 209 S. W. 969; Milward v. Wab. Ry. Co., 232 S. W. 226; Swinehard v. K. C. Rys. Co., 233 S. W. 59, 63; Lane v. Anheuser-Busch Brew Co., 241 S. W. 454; Bona v. Luehrman, 243 S. W. 386, 389; Angle v. Fleming, 259 S. W. 143; Conway v. Silver King Oil & Gas Co., 94 S. W. (2d) 942, 946; White v. Williams, 59 S. W. (2d) 23, 43.]

Complaint is made of the argument to the jury of plaintiff's counsel. We find that no objection was made or exception saved to the remarks of counsel that if they found defendant liable for damages the jury need not worry about defendant paying the same.

Complaint is made of the action of plaintiff's counsel in interrupting counsel for the defendant in his argument to the jury. A great number of instances are referred to in this connection by the defendant. Part of the argument, but not all, appears in the abstract. In some of the instances in question there is not enough of the argument preserved for the court to intelligently pass upon the point raised. In other instances it appears that defendant's counsel was attempting to argue the question of contributory negligence to the jury, which was not an issue and not a proper subject for the jury's consideration. [Stout v. K. C. Pub. Serv. Co., 17 S. W. (2d) 363.] In one instance, counsel for defendant asked the jury, in effect, to put themselves in the place of the defendant. This was improper argument. [Sweaney v. Wab. Ry. Co., 80 S. W. (2d) 216, 222.] At one place in his argument counsel for the defendant stated: "Mrs. Brosnahan was an ordinary person. You must weigh her actions by what an ordinary person would do. If you find that an ordinary person like Mrs. Brosnahan . . . The Court: (Interrupting) . . . of course, the law is ordinarily careful and prudent person, not ordinarily careful. Mr. Tucker: Under the same or similar circumstances, if the Court please. The Court: Ordinarily careful and prudent, yes." Thereafter, counsel for defendant apparently accepted the court's theory of the law that the person must not only be ordinarily careful but an ordinarily careful and prudent person, by arguing to the jury the instructions in the light of the court's addition to the rule stated by him. It is insisted that this voluntary interruption by the court tended to tell the jury that Mr. Tucker was drawing improper inferences from the evidence. We think that the conduct of the court is not subject to the objection now made. Counsel accepted the law as stated by the court. We fail to see how it can be said that the court intimated to the jury that counsel was drawing improper inferences from the evidence for, if anything, it was a comment upon the law, not the evidence, and there is no point made concerning such a matter.

The point is made that counsel for plaintiff argued the case to the jury to the effect that, because the daughter looked out of the rear

window of the car after the collision and saw what had happened, defendant could have seen deceased in time to have avoided striking him by looking through the rear vision mirror or out of the window on her side. In arguing a case to the jury counsel is allowed a wide latitude in drawing inferences from the evidence. In this case it was proper to infer from the testimony that if the daughter could have seen back, the defendant could also have seen. [Hancock v. Kansas City Terminal Ry. Co., 100 S. W. (2d) 570, 582.]

The matter of discharging the jury because plaintiff cried while her case was being argued was within the discretion of the court. [Chackley v. Wabash Ry. Co., 297 S. W. 20, 25.]

Other points raised under the heading "Argument" in defendant's brief are not mentioned in her "Assignments of Error" and for that reason cannot be considered. [Kiger v. Sanko, 1 S. W. (2d) 218; Miller v. Mutual Benefit Health & Accident Ass'n., 80 S. W. (2d) 201.]

Defendant, in her reply brief, asks leave to make some new and additional assignments of error to supply what she says she inadvertently left out of her original brief. Plaintiff makes objection to this request and, of course, it cannot be granted. [Spangler-Bowers v. Benton, 83 S. W. (2d) 170; Consolidated School District v. Power Co., 46 S. W. (2d) 174.]

The judgment is affirmed. All concur.