CONSOLIDATED SCHOOL DISTRICT NO. 3, GRAIN VALLEY, v. WEST MISSOURI POWER COMPANY, Appellant.—46 S. W. (2d) 174.

Division One, February 11, 1932.

*Sparrow & Patterson, Charles D. Cappelle, Gardner Smith* and *Edward J. Tangney* for appellant.

*Burrus & Burrus* and *Mosman, Rogers & Buzard* for respondent.

694

ATWOOD, J.—This is an action for damages for the alleged negligent burning of respondent's school building and equipment. We quote as follows from appellant's statement of the case:

"Appellant was the owner of an electric light system, with its plant at Pleasant Hill. Its wires extended north from Pleasant Hill to U. S. Highway No. 40, thence east along said highway, past the Town of Grain Valley to Odessa. This line was commonly referred

to as the 'high line.' The wires on this line carried 22,000 volts. At a point on the high line about one-half mile south of Grain Valley was what was known as a substation, from which a line of three wires extended north to the town along the west side of North Broadway, past the schoolhouse, through the town and on to the northern part of Jackson County. These wires were known as 'primary wires.' They carried 6600 volts and were located on poles of standard height and size, equipped with standard cross-arms, to which the wires were fastened in a proper manner. On these same poles and at a proper distance beneath these primary wires, and fastened in a proper manner to other standard cross-arms, was a line of two wires known as 'secondary' or service wires. These wires carried 110 volts and conducted current into the various houses and other buildings equipped for lighting. In order for current to get from the high lines onto the primary wires, it had to pass through a large transformer at the substation, and as the current passed through this transformer the voltage was reduced from 22,000 to 6600 volts. In order for the current to get from the primary wires onto the secondary or service wires, it had to pass through another, but smaller, transfomer. These transformers were located on the poles at various places in the town. As the current passed through one of these transformers, the voltage was thereby reduced from 6600 to 110 volts. All wires were of standard size, make and design. The service wires were insulated. One of appellant's poles, carrying this line of primary and secondary wires along North Broadway, was located on the west side of the street and somewhat south of the school building. On this pole was a metal transformer of standard size, make and design. On each side of the pole, and properly fastened to the cross-arm, was a fuse box of standard make and design. The current, in passing from the primary wires onto the secondary or service wires, had to pass through these fuse boxes and then through the transformer. The purpose of a fuse box, it may be said here, is to prevent an excessive current from escaping from the primary wires into the transformer and there onto the service wires and into the buildings, the mechanism of the fuse box being such that if a current in excess of 6600 volts entered it from the primary wires it would 'blow' the fuse, and disconnect the current and thus prevent it from entering the transformer or escaping onto the service wires. The transformer on this pole fed current to service wires leading into five residences and the schoolhouse, viz., the residence of Mrs. Wright, W. M. Hall, J. M. Hall and the schoolhouse on the west side of the street, and the residences of Mrs. Armstrong and Mrs. Rowe on the east side of the street. That transformer served no other residence or building of any kind. Appellant's service wires, over which current was carried into the

school building, extended only to the outer wall of the building. The electric equipment in the building was neither furnished nor installed by it, excepting only a meter fastened to a piece of asbestos and nailed to a joist in the northeast corner of the basement.

"Sometime during the forenoon of Saturday, November 7, 1925, fire was observed on the pole on which was located the transformer and fuse boxes above mentioned. Some witnesses testified that the transformer was afire, while others were equally as positive that it was not the transformer, but one of the fuse boxes that burned. At any rate, about noon, fire was discovered in the basement of the schoolhouse. At that time, there was in the basement a large pile of soft coal, extending in height at one point almost up to the joist on which the meter was fastened. Around this pile of coal were broken seats, some benches, tables, wastepaper baskets, floor oil, sweeping compound, floor mops, coal oil, paint and some discarded books. As a result of the fire the schoolhouse was destroyed. Thereafter respondent instituted this suit, claiming that appellant negligently permitted an excess current of electricity to escape over its wires into the school building and set fire thereto. A verdict for $25,611 was returned by the jury and judgment was entered thereon. After unavailing motions for a new trial and in arrest of judgment, appellant brings the case here on appeal."

Appellant's first assignment of error is that "the court erred in refusing to give to the jury, at the close of all the evidence, appellant's peremptory instruction to find for appellant." Counsel for appellant say this was error because respondent "failed to prove with *reasonable certainty* that the schoolhouse burned as a result of any negligence on the part of appellant." Defendant sought to show at the trial and appellant here contends that the fire was caused by the spontaneous combustion of coal piled in the basement, but the question was submitted on conflicting evidence and the sole matter for our consideration under this assignment of error is whether on the whole record there was sufficient evidence to go to the jury on defendant's negligence, and in such consideration we must disregard any part of appellant's above statement of the case inconsistent with evidence hereinafter noted.

Plaintiff introduced substantial evidence tending to prove that on the morning of the day the schoolhouse burned a transformer on the high line immediately south of Grain Valley was on fire; that two transformers were maintained on the high line at that point, both being necessary to make the 3-phase circuit leading into Grain Valley; that some two months before the schoolhouse burned the primary wires between the railroad and Highway Number 40 had been seen to emit sparks where they passed through trees; that the

high line and primary wires were not insulated; that the light wires rubbed against tree branches and emitted sparks at such points of contact; that the transformer on the pole near the schoolhouse, from which the secondary system or service wires to the schoolhouse extended, and the primary wires on the cross-arms leading thereto were on fire and burning between 9:30 o'clock and noon on the morning of the day the schoolhouse burned; that shortly before noon the street lights were on and appeared very bright, while the lights in the stores and buildings were barely red; that tree branches extended through the wires near this place; that the schoolhouse was first observed to be on fire about 12:30 in the afternoon of November 7, 1925; that shortly before the schoolhouse burned the service wires leading thereto were sagging, swaying, striking together and smoking and flashing; that this transformer near the schoolhouse had no ground wire; that it burned and finally fell from the pole; that two fuse boxes were located on the cross-arm above the transformer but only one burned; that word came to the house of one of defendant's employees about noon of the day the schoolhouse burned that there was trouble on the line at Grain Valley; that the fire started in the basement of the schoolhouse at the place where the meter was located and where the light wires entered the building; that before a pile of coal will spontaneously burn it will pulverize, heat and give off noticeable gases; that the pile of coal in question did not exceed fifteen tons, had been in the basement only about a month, and had not evidenced the formation of heat or gases; that no wood, paper or rubbish was in contact with the coal, and after the fire about twelve tons were removed in good condition, and showing no evidence of spontaneous combustion; that there had been no fire in the schoolhouse since the previous Friday afternoon, and all doors and windows in the building were closed and locked.

Plaintiff offered a witness who qualified as an electrical expert of wide experience. He was asked whether, if a transformer got on fire and burned on a 22,000 volt line, it "would permit those 22,000 volts to get onto the 6600 volt line, and then if the 6600 volt transformer burned, you would get those 22,000 volts onto the wires going into the house?" He replied that it was possible and that such would logically follow. He further said that in case of a fire in this transformer on the high line it would be possible for the voltage to pass through the transformer by way of other transformers so that the 22,000 volts would be on the secondary side of the primary line transformer, and that the 6600 volt wires would then be carrying 22,000 volts, thus overloading the transformer on the primary line and causing it to burn, in which case the 22,000 volts would be conducted to the secondary side; that if 22,000 volts got onto one

of the 6600 wires it would certainly burn the transformer and a flame of fire might be emitted therefrom. He was also asked, "suppose you had a transformer and you saw it on fire, burning, and you observed these secondary wires striking each other and flashing, what does that indicate?" Replying, he said that it indicates improper maintenance and construction of the secondary wires in the first place, and it may indicate that the wires are arcing, due to excessive voltage, or flashing, due to excess voltage coming through a defective transformer. The following question was also propounded to him: "Suppose you would have a condition such as I have mentioned, that is, a fire, in the 22,000 volt transformer, and a fire in the 6600 volt transformer, and the flashing or arcing of a secondary line of wires that run into the schoolhouse in question, and suppose you have a meter in the schoolhouse connected onto pine joists, put on a pine board and bolted or nailed onto the pine joists, might or might not that be reasonably expected to cause a fire at the meter, or near the meter?" His reply was: "It could." He also stated that it would be possible for nothing to occur in other buildings on the same secondary system of wiring, because it would burn at the weakest place; that excessive brightness or dimness of lights indicates an excessive amount of electricity passing through a transformer; that a transformer on fire and burning indicates that it is defective; that the proper method of installing a secondary system calls for the grounding of every transformer connected therewith to protect against excessive voltage; that primary wires are ordinarily weatherproof, insulated, and such is practicable and standard construction, and lack of it aids in contact with ground and other wires, between the primary and secondary wires, and between the primary wires and other grounds; that if the insulation burns off at just one place inside the transformer and the primary and secondary wires come in contact in just one place the current will pass from the primary to the secondary wire without destroying the transformer although later the transformer will be destroyed; that primary and secondary wires can be in contact in one place and still the transformer may operate and give illumination in residences without any further trouble. He further testified that if the fuse box burned it would indicate an excessive voltage on the primary wires, and if you had an uninsulated wire with an excessive voltage on it running through trees where secondary wires also ran the contact of the limbs would naturally conduct the current from one circuit to the other. Speaking of the fuses, he said:

"The size of the conductor which passes from this end clear to that end (indicating), has a certain carrying capacity of current, and amperes, before it melts, regardless of whether that current is 110 volts or 10,000 volts, a certain number of amperes will melt that

wire, a definite number now. And if that wire melts, the distance between the two terminals will be the distance shown between these two copper strips, surrounding the ends of the fuse. Now, the voltage, to arc across and to continue to form in the fuse box must be sufficient to continue the arc.

"Q. Or jump? A. Or jump, or flash across this space. This spacing has been designed for a given voltage, so when this fuse does melt, the voltage will not jump across, and if it continues to arc across there so that it makes a fire, it is an indication of excess voltage.

"Q. Now, Mr. Henrici, if it continues to arc across there, would or would not that arc cause that high voltage to go on to those wires? A. That is correct. There are two of these fuses, and, under ordinary circumstances the accuracy with which the fuse wire is made, and the length of the use, of the wire itself is of sufficient regularity, so that one fuse will generally burn before the second one burns. Now, one fuse may burn, but the other may continue to carry the excess voltage over to the transformer, and through the transformer to the secondary wires, even when one fuse has blown."

On cross-examination of this witness counsel for defendant sought to show that a short might have occurred at or near the meter in the basement of the school building. Recurring to this subject on redirect examination the following questions and answers appear:

"Q. And if that short existed as he has mentioned to you, and there was an overload of 6600 or 22,000 volts from the secondary wires running into the school house, would or would not that be affected by the short? A. It would.

"Q. In what way? A. Well, whatever disturbance which caused the wires which are ordinarily permanently separated from each other, which would cause the wires to be brought together would cause an arc and the high voltage would jump and make an exceedingly heavy flash, which, of course, would ignite anything in the neighborhood of it.

"Q. Because of the heavy load? A. Because of the high voltage, yes sir.

"Q. Would it or would it not arc across the weakest link in the chain and find an outlet, this high voltage? A. It would."

As we read the evidence in this case it is unlike that appearing in Epperson v. Postal Telegraph Co., 155 Mo. 346, 382, 50 S. W. 795, 55 S. W. 1050, cited by appellant, where the damages were occasioned by one of two causes, for one of which defendant was responsible and the other not, and the probabilities were "equally strong that the damages were caused by the one as by the other." Nor do we consider the other cases cited by appellant as applicable. The court, on its own motion, gave Instruction C-2 withdrawing from the jury's consideration all testimony as to defendant's wires passing

through trees and touching the limbs and boughs of trees, but the evidence finally submitted pointed with reasonable certainty to an excessive amount of electricity on defendant's wires as the cause of the fire, and defendant's demurrer to the evidence was properly overruled. Defendant's evidence tending to contradict the case made by plaintiff is not for our consideration under this assignment of error.

Counsel for appellant next say that plaintiff's Instruction P-1 is broader than the evidence and fails to submit to the jury the specific acts of negligence, if any, shown by the evidence, and for that reason should not have been given. The instruction is as follows:

"The court instructs the jury that the law made it the duty of the defendant to use and exercise the highest degree of care in using, handling and dealing in electricity so as to prevent injury to persons or property.

"Therefore, you are instructed that if you find and believe from the evidence in the case that the defendant negligently and carelessly permitted its transformers, mentioned in evidence, to be and become defective in that a greater current of electricity was permitted to pass through said wires than was reasonably safe, if you find such conditions existed, and if you find and believe from all of the facts and circumstances in evidence that as a direct and proximate result of the negligence, if any, on the part of the defendant in permitting said transformers to become and remain defective in the manner aforesaid, if such conditions did exist, fire was set to the schoolhouse in question and it was thereby burned and destroyed, then your verdict must be for the plaintiff and against defendant.

"By the terms 'negligence' and 'negligently and carelessly' as used in this instruction is meant the failure to use or exercise the highest degree of care, and by the term 'highest degree of care' is meant such care as would ordinarily be used or exercised by a very careful and prudent person engaged in the same business and under similar circumstances."

Counsel for appellant insist that there was no evidence that the transformers were defective except testimony which, they say, was negative and not substantial, that the transformers were not grounded. This claim overlooks positive testimony that one of the transformers on the high line at the substation and the transformer near the schoolhouse leading from the primary to the secondary wires were on fire and burning on the morning of the day the schoolhouse burned, and testimony, clear and cogent, of plaintiff's electrical expert to the effect that a transformer on fire and burning is an indication that the transformer was defective. There was substantial evi-

dence that the transformer near the schoolhouse was on fire right after nine o'clock in the morning of the day the building burned Defendant had a "trouble shooter" in Grain Valley and it was for the jury to say whether or not defendant's failure to discover and remedy this open and obvious defective condition, which continued for about three hours before the building appeared to be on fire, constituted negligence under the instructions given. We see no merit in appellant's further claim that there was no evidence "of any defect in the transformer on the pole near the schoolhouse." The court did not err in giving this instruction.

It is next insisted that plaintiff's Instruction P-2 was inconsistent with and contradicted defendant's Instruction C-17, as modified and given by the court. These instructions are as follows: "P-2. The court instructs the jury that if you find the issues for the plaintiff you should assess its damages at such sum as you believe, from the evidence, the schoolhouse and contents were reasonably worth at the time they were destroyed.

"6-17. The court instructs the jury that if you find and believe from the evidence that plaintiff is entitled to recover, you should, after taking into consideration the age and condition of said school building and equipment, the depreciation, if any, in the value thereof on account of age, use or any other cause, and all the other facts and circumstances detailed in evidence, allow plaintiff as damages only the reasonable value of said building and equipment at the time of said fire after deducting therefrom the reasonable value of the salvage, if any, from said building, and the reasonable value of the basement of said building used by plaintiff in the construction of a new building, if you find from the evidence it was so used."

When these two instructions are read and construed together, as they must be, we do not think the jury could have been misled. P-2 limits the amount of recovery to the reasonable worth of the building and contents actually destroyed. If the basement was of any value to plaintiff in the construction of the new building or if plaintiff salvaged any other values from the building and equipment it seems clear enough that such values were not destroyed in the sense that proper deductions therefor could not be made in accordance with Instruction C-17. This assignment of error is ruled against appellant.

Counsel for appellant next insist that Instruction C-2, given by the court at the close of the trial, withdrawing from the jury all testimony regarding defendant's wires passing through trees and touching limbs, did not cure the error resulting from the admission of such testimony, and because of the admission of such testimony the judgment should be reversed. Instruction C-2 is as follows:

"All the testimony introduced in this case as to defendant's wires passing through trees and touching the limbs and boughs of the trees

is withdrawn from the jury's consideration and the jury will disregard the same."

The first testimony indicating contact of defendant's wires with trees appeared in the direct examination of plaintiff's witness Williams, when he said that about two months before this fire occurred, when they had trouble before with the electric lights, he had observed sparks in the trees through which the wires extended between the railroad track and Highway Number 40. After the answer was given counsel for defendant moved that it be stricken out "for the reason that there is no evidence that there was any trouble before." The court properly denied the motion because the witness said that there had been trouble before. Later in the same examination this witness was asked: "Did the light wires rub against the limbs of the trees?" His answer was: "They did." No objection was then made, but after several other questions had been propounded and answers given, defendant's counsel said: "I want the record to show that we object to all of this line of testimony, and ask that it be stricken out for the reasons heretofore given." The court said: "All right, the record so shows." But the record shows no ruling or any request for ruling thereon, or any exception saved. The same witness later testified that there were trees in the neighborhood through which the wires passed. Counsel for defendant did not object until after the answer was given, and then did not move to strike out. We have repeatedly held that such action amounts to no objection at all. The same witness later testified, without objection, that these trees extended up through the wires. Later in the direct examination of plaintiff's witness, Fender, he was asked where the wires ran with reference to certain trees. Defendant's counsel made timely objection on the ground that "there is no charge of negligence in permitting the wires to come in contact with the trees," and the objection was overruled. However, when the witness answered he did not say that the wires were in contact with the trees, and further said that he did not observe any condition there with reference to these light wires in the trees. When this line of testimony was touched upon in the examination of plaintiff's electrical expert no such objection was interposed. It is true that plaintiff's petition contained no charge of negligence in permitting defendant's wires to come in contact with trees, and in offering this character of testimony counsel for plaintiff said it was for the purpose of showing how the excessive load of electricity could have passed onto the secondary wires, and not as a ground of negligence. At the close of the case the court was of the opinion that such evidence should not have been admitted and clearly and emphatically withdrew it from the jury by giving the above instruction. We have carefully examined the whole record pertaining to this point, as well as the cases cited by appellant, and are

satisfied that whatever error, if any there was, in admitting this testimony was cured by the withdrawal instruction.

The next point urged as ground for reversal is that "the verdict was grossly excessive and shows upon its face that it was the result of bias, prejudice and passion on the part of the jury." The verdict was for $25,611. The schoolhouse was a two-story building of brick construction put up in two substantially equal parts at different times. The first half was 72 feet long and 32 feet wide, built in 1908 at a cost of $10,600, exclusive of cost of heating plant, according to the testimony of the contractor who built it. The newer half was constructed in 1918 or 1920 at a cost of $7,770, exclusive of the cost of the heating plant. The building had a brick and stone foundation, a shingle roof which was practically new, and a steam heating plant practically as good as new which had been put in at a cost of $2700. It also contained a library and other equipment, all in very good condition, and there was substantial evidence that the cost of replacing same new was $4671.37. The builder of the original part of the schoolhouse testified that the reproduction cost on November 7, 1925, date of the fire, of the entire building as then equipped was $40,000. It was further shown that building costs on that date were greatly in excess of similar costs at the times the schoolhouse was constructed. Depreciation estimates ranged from five per cent on the whole building to fifty per cent on the old part and fifteen per cent on the new, and there was testimony that the original cost of the old part of the building did not exceed $4500. The amount of the jury's verdict was well within the range of the evidence and should not be disturbed.

Finally, a reversal is urged because of alleged misconduct of a juror. At the close of the first day of the trial the court instructed the jury as follows:

"Now, gentlemen of the jury, during the progress of this trial it will be well for you to refrain from talking about incidents that arise during the trial, for fear that you will commit yourself to some theory of the case before the trial is over. Wait until the trial is over and you have retired to the jury room before you even talk among yourselves about the case, and permit no one to speak of it in your presence. You will be excused now until tomorrow morning at nine-thirty."

Attached to defendant's motion for a new trial and made a part thereof was an affidavit in which affiant stated that on June 7, 1928, and during the progress of the trial, a certain named juror engaged him in conversation and asked him "what would happen to a transformer when it burns up," and affiant told him that it wouldn't take long for a transformer to burn up; that it would look like a bucket

placed in a fire; that the outside of the metal would be charred.'' The affidavit further alleged that this juror also said to affiant at the same time and place:

''Yes, but they tell me there were no lightning arresters on the pole—

''They tell me that the electric light company has paid twenty-three hundred dollars for the garage that was burned up at Grain Valley. I understand there were two other fires caused by the electric light company at Grain Valley, one the garage and one other.''

A counter affidavit was filed by the juror in question specifically denying the allegations of the affidavit attached to defendant's motion for a new trial, and alleging the true facts to be as follows:

''That on or about June 7th, 1928, I did, on the northeast corner of the square at Independence, about 8:40 o'clock, A. M., speak with the said F. W. Kitchener and did ask him what would happen to a transformer when it burns up. He made the reply that the oil would burn first and boil out of the transformer and the transformer would be out of commission.

''I did not connect this comment with the light company, and did not know any other fire was caused by light company, and paid no other attention to the remark. That is the sum and substance of all of our conversation.

''I heard someone say while I was passing on sidewalk that there was some other fires in Grain Valley. It was a garage, and the man had had a fire at Atherton and that he was at Pleasant Hill now.''

This affiant further alleged in this affidavit that said conversation did not in any manner influence his finding or verdict. Affidavit of another member of the jury was also filed stating that the juror in question ''did not at any time relate any conversation that he had had with any persons during the trial of said cause or at any other time, either to me personally or in the jury room while the jury was deliberating on a verdict in said cause.''

While the conversation that this juror concededly had was in violation of the court's instruction, yet the information gained as to what would happen to a transformer under the given circumstances was not in conflict with the substance of defendant's own evidence. The other contents of the first affidavit and counter affidavits were conflicting. After all, the sole question is whether or not this juror's misconduct prejudiced defendant. The determination of such a question is largely within the discretion of the trial judge (Evans v. Klusmeyer, 301 Mo. 352, 256 S. W. 1036; Turnbow v. Kansas City Rys. Co., 277 Mo. 644, 211 S. W. 41; Copeland v. Wabash Railway Co., 175 Mo. 650, 75 S. W. 106), and we do not think he abused this discretion in refusing to grant a new trial.

The case appears to have been tried without reversible error and the judgment is affirmed. All concur.

## ON MOTION FOR REHEARING.

ATWOOD, J.—In their motion for rehearing counsel for appellant says that our opinion overlooks the question "whether or not the trial court committed error in giving respondent's Instruction P-1 because such instruction failed to submit to the jury the specific acts of negligence, if any, shown by the evidence." In ruling that "the court did not err in giving this instruction" we necessarily decided the question, although the reasons were not given. We have no fault to find with respondent's contention that the language "that the defendant negligently and carelessly permitted its transformers, mentioned in evidence, to be and become defctive in that a greater current of electricity was permitted to pass through said wires than was reasonably safe," appearing in this instruction, was a sufficient specification of negligence. Furthermore, defendant in its instructions numbered 12 and 13 by specific reference to this instruction adopted the same theory of submission and it is not now in position to urge that it was erroneous. [Fowlkes v. Fleming, 17 S. W. (2d) 511, 516, 322 Mo. 718; Gary v. Averill, 12 S. W. (2d) 747, 761, 321 Mo. 840; Von Eime v. Fuchs, 8 S. W. (2d) 824, 320 Mo. 746; Hebenheimer v. City of St. Louis, 269 Mo. 92, 189 S. W. 1180.]

Counsel for appellant also say that the opinion overlooks the question "whether or not the trial court committed error in giving respondent's Instruction P-1 because such instruction did not require the jury to find that appellant knew of the alleged negligent conditions set forth in respondent's petition, or by the exercise of ordinary care it could have known thereof, in time to have removed such conditions, but negligently failed to do so." No such criticism of Instruction P-1 appears in the points and authorities listed in appellant's original brief. It seems to have been advanced for the first time in the reply brief, and under our Rule 15 it should not be considered. [Cech v. Mallinckrodt Chemical Co., 20 S. W. (2d) 509, 516, 323 Mo. 601; Orchard v. Missouri Lumber & Mining Co., 184 S. W. (Mo.) 1138; Simmons v. Affolter & Cowan, 254 Mo. 163, 162 S. W. 168.]

For the above reasons appellant's motion for a rehearing is overruled. All concur.