CLARENCE DAVIS, Appellant, v. KANSAS CITY PUBLIC SERVICE COMPANY, a Corporation, Respondent, No. 41768—233 S. W. (2d) 669.

Court en Banc, October 9, 1950.

Rehearing Denied, November 13, 1950.

*Homer A. Cope* and *Walter A. Raymond* for appellant.

*Charles L. Carr, Alvin C. Trippe, Hale Houts* and *Hogsett, Trippe, Depping, Houts & James* for respondent.

[671] ELLISON, J.—On the defendant-respondent's application, this court ordered this cause transferred here from the Kansas City Court of Appeals. The opinion of that court is reported in 223 SW. (2d) 1. The plaintiff-appellant sued the respondent for personal injuries and property damage sustained in a collision in Kansas City between one of respondent's streetcars and his own automobile, and recovered a verdict for $5500. His cause was submitted to the jury under the humanitarian doctrine.

At the close of appellant's case and again at the close of the whole case respondent moved for a directed verdict under Sec. 112 of the Civil Code. Both motions were overruled. But the trial court sustained respondent's motion for new trial on the stated grounds of "misconduct of a juror and error in instructions," the plaintiff appealing. The Kansas City Court of Appeals reversed that order and remanded the cause to the circuit court with directions to reinstate the verdict and enter judgment thereon.

In its brief here respondent's main points are that the trial court erred in overruling its motions for a directed verdict, but ruled correctly in ordering the new trial because: (1) the foreman of the jury was guilty of misconduct while the cause was under submission, in reading a book at the Kansas City Public Library giving the stopping distances of automobiles at various speeds on application of the brakes, and communicating the information to the other jurors; (2) the appellant's main instruction No. 1 was erroneous. There are other subsidiary points, but the facts must be stated before discussing any of the assignments of error. Seven briefs are presented, including those filed in the Kansas City Court of Appeals, and the record is full of important but conflicting factual detail. To avoid apparently arbitrary conclusions part of the facts must be set out at some length.

The collision occurred at the intersection of Swope Parkway and 59th street in October, 1944. The Parkway has two vehicular traffic roadways running north and south. Between them is a parkway in which are located two parallel streetcar tracks. Northbound traffic uses the east track and roadway and southbound traffic the west. Both appellant's automobile and the streetcar were traveling north. The latter had stopped at 61st street, 2 blocks south, to discharge passengers. It was loaded to capacity and would not take on more passengers. The appellant's automobile passed the streetcar and continued north to 59th street and there turned left, or west, across the east track on which the northbound streetcar was approaching, resulting in the collision.

Before appellant's automobile had cleared the track the streetcar ran into the "rear left part" of it with such force that it was

pushed northward beyond the north curb of 59th street and into a pole, where it came to a dead stop. It was badly damaged, and the plaintiff was thrown to the pavement and rendered unconscious. A rear view photograph of the automobile (exhibit 15) taken at the scene of the collision by a police officer, shows the rear of the left fender and corner, and the body and trunk, crushed and pushed some to the right. The automobile came to rest with the right rear corner pressed against what appears to be a metal trolley pole. A side view photograph (Exhibit 23) taken later for appellant shows the left rear fender was also flatly indented some along the side over the left rear wheel, but the heavy indentions came from pressure [672] behind. There can be no doubt that the automobile was struck after it was making the left turn and probably proceeding angularly toward the right side of 59th street.

According to appellant's testimony he looked back when he was about 40 or 50 feet south of the south curb of the 59th street intersection and saw the streetcar approaching 250 or 300 feet away. He was then traveling 25 miles per hour near the west curb of the street, and slowed down to 10 miles per hour as he started the left turn, at the same time extending his arm to indicate it. The distance across the parkway was about 12-14 feet. When the front wheels of his automobile reached the east rail of the northbound track he looked south again and the streetcar was about 100 feet away. He didn't look back after that to judge the speed and distance of the streetcar and slackened his speed somewhat, because a southbound streetcar had stopped at the intersection, and he gave his attention to 5 or 6 passengers discharged from that car—particularly a boy who was crossing in front of him. He could have stopped, but didn't realize the need of it. He knew he slowed down, but couldn't remember whether he stopped, because he was knocked unconscious. It was developed by respondent that in his police court testimony appellant also said he thought the streetcar would slow down or stop because of those same discharged passengers.

There was supporting testimony from two college students, Richard Chandler, age 21, with 7 years experience as an automobile driver, and Lester McCollum; and two high school students, Norma De Lorenzi, age 18, and Ted Pulhamus, age 16. The first three were standing at the northeast corner of the 59th street intersection near the northbound streetcar track. Pulhamus, a discharged passenger from the southbound streetcar, was in the 59th street intersection between the two streetcar tracks. It may be inferred he was the boy referred to in the appellant's testimony. None of these witnesses heard the northbound streetcar give any warning signal.

Chandler saw appellant's automobile turn left and straighten up west into 59th street moving across the streetcar tracks. It was right on the northbound track when he saw the streetcar about 150

feet south approaching at 35-40 miles per hour without slackening speed. The front of the streetcar struck the left rear fender of the automobile and ran on for about a block (300 feet). On cross-examination he estimated the automobile might have moved 3 feet at 3 miles per hour on account of traffic while the streetcar covered the intervening 150 feet. This would have meant the streetcar was going 150 miles per hour. On redirect examination he eliminated the three foot *distance* the automobile had moved, but adhered to his former estimates that the streetcar was advancing at 35-40 miles per hour while the automobile was moving 2-3 miles per hour.

McCollum testified appellant's automobile was about 10 feet south of the 59th street intersection going north on Swope Parkway when he first saw it. It slowed down to about 5 miles per hour and made a left hand turn into 59th street, and the front part was on the northbound streetcar track, but it didn't get completely across because it had to stop on account of "southbound traffic" [discharged passengers from the southbound streetcar?]. The northbound streetcar then was about 150 feet away, and approached at 35-40 miles per hour without slackening speed. He didn't notice whether appellant gave a left turn hand signal. The left front part of the streetcar struck the "very rear part" of the automobile on the northbound track in the north middle part of the intersection, and moved on 300 feet.

Pulhamus testified the streetcar was going north and appellant's automobile west when the latter was struck. He had got off the *south*bound streetcar and was in the intersection waiting for the northbound car to pass. Other people were there too. The streetcar was then about 100 feet away, approaching at 35-40 miles [673] per hour. The front of the automobile was nearly on the east rail of the northbound track going about 2 or 3 miles per hour and facing west. All but the left back part had got across both rails of that track when the collision occurred, and the streetcar ran on for about a block (300 feet). On cross-examination he said the automobile was within 1 to 5 feet of the east rail of the northbound track when he first saw it, and it was moving 2 or 3 miles per hour. It could have been stopped almost instantly, but wasn't. Here he changed his testimony on direct examination and said the automobile was headed northwest instead of west—which would have been toward the right side of 59th street.

Miss De Lorenzi testified she was waiting with others for the northbound streetcar to make a traffic stop at the northeast corner of the 59th street intersection. She saw the streetcar about ¼th block (75 feet) to the south, approaching at a fast rate. Appellant's automobile was stopped and waiting for the other traffic to go north. It was almost all the way over the northbound track headed west. She couldn't say how far off the streetcar was when the

automobile stopped, but she continued to watch it and it did not decrease its speed. After the collision the streetcar continued almost a block. On cross-examination she again said the automobile was waiting for traffic and that the northbound streetcar then was about 75 feet away.

The motorman, age 26, a recent employee and trainee, had actually been operating streetcars for only about two weeks. He testified for respondent that as he approached the 59th street intersection he had his hand on the brake lever and was reducing the speed of the streetcar. It was somewhat downgrade in that direction. He began ringing the bell when he came within 75-85 feet of the 59th street curb line. He did this because his car was filled to capacity, another car was following, and he *did not intend to stop* at the 59th street loading zone. Appellant's automobile ran alongside the streetcar near the west curb up to about the middle of the block [or about 150 feet from the 59th street intersection] and then forged ahead 20 or 25 feet. When the streetcar was *20 or 25* feet south of the 59th street intersection going *18 or 20* miles per hour, the automobile without any warning cut the corner and swung over to the left into the street in front of the streetcar where there was a ''Slow'' sign, at a speed of 10 or 15 miles per hour. The motorman saw the 5 or 6 passengers discharged from the southbound car in the loading zone. He put on the emergency brakes, locked the wheels, and ran about 15 feet into the collision while the automobile was still moving five miles per hour. After the impact he released the brakes and the streetcar rolled about 300 feet.

On cross-examination the motorman stated the streetcar was going about 25 miles per hour when he first sounded the bell, and that his minimum speed before the collision was 10 or 15 miles per hour. He said at that speed the brakes would stop the streetcar in 32-35 feet; at 18 miles per hour it would be 35-40 feet; at 20 miles, 50-55 feet; at 25 miles, 65-67 feet; at 30 to 32 miles, 75-85 feet. Then he gave that same distance for 25 miles per hour. Respondent's counsel produced a photograph of the street intersection looking north, and had the motorman make an X mark and an XC mark thereon, respectively showing the location of the streetcar and the automobile when the latter started to turn into 59th street. He said the streetcar then was traveling *20 or 22* miles per hour, and was *35 or 40* feet south of the intersection and the automobile, which was then traveling about 15 miles per hour. He applied the emergency brakes immediately and reduced his car's speed *by* 9 or 10 miles per hour *to* 12-15 miles per hour.

As will be seen his testimony was conflicting in that: on direct examination he said his streetcar was 20 or 25 feet from the automobile and going 18 or 20 miles per hour when the latter made the sudden turn into 59th street; whereas on cross-examination he

said that distance was 35 or 40 feet, and the streetcar speed [674] was 20 to 25 miles per hour. Also, if the automobile was 20-25 feet ahead (north) of the streetcar, and the latter was 20, 25 or 30 feet *south* of the intersection when the automobile began to turn, as the motorman said, then the two must have been about even, and the automobile made almost a square turn. Or if he meant the automobile was the given distances south of the intersection, and the streetcar those distances behind the automobile, the distances must be added.

Several other witnesses who were passengers on the northbound streetcar, or otherwise spectators, estimated its speed at 20-25 miles before appellant turned across the track, one witness said 20 miles per hour, and the conductor on the southbound car thought it was only 15-20 miles per hour. Four of these witnesses said the bell on the northbound streetcar was sounded; four said the automobile "cut across the track"; one said the automobile was going 30 miles per hour; and two said the appellant gave no signal before making the left turn.

We take up first respondent's second assignment, that appellant's main instruction No. 1, based on the humanitarian doctrine, was erroneous because it was not supported by submissible evidence. The instruction was predicated on the motorman's failure to slow down *and* sound a warning, after he saw the appellant in a psition of imminent peril. Respondent makes four points under the assignment. The first is that appellant is bound by his "*personal*" testimony, citing the decisions listed below.[1]

We confess we do not understand this contention. Does it mean he is bound by his *own* testimony, and cannot avail himself even of the testimony of his other witnesses? If so it is wrong even under the decisions it cites. What the Steuernagel case, supra,[1] says is: "The respondent cannot claim any benefit of any of appellant's evidence which contradicts her own testimony *and* is at war with her own *theory* of the case"(italics ours), citing the Meese-Thompson case, supra.[1] But that case holds a plaintiff *may* avail himself even of favorable evidence offered by the *defendant,* unless it "runs counter to some other theory of recovery relied upon by the plaintiff." Likewise the Hemminghaus case, supra,[1] holds a plaintiff can avail himself of favorable testimony of a defendant, but that he cannot invoke it on one theory of recovery as to one defendant, and reject it on a different theory as to another defendant. And such is the general rule as to estimates of time, speed and distance. The appel-

---

[1]Venditti v. St. L. Pub. Serv. Co., 360 Mo. 42, 226 SW. (2d) 599, 603(9); Hemminghaus v. Ferguson, 358 Mo. 476, 491(4), 215 SW. (2d) 481, 489(14); Steuernagel v. St. L. Pub. Serv. Co., 357 Mo. 904, 907(3), 211 SW. (2d) 696, 698(3); Meese v. Thompson, 344 Mo. 777, 782(1), 129 SW. (2d) 847, 850(1).

lant's testimony on these matters was not a judicial admission but an estimate, and obviously he could avail himself of the testimony of his own witnesses thereon. See also: State ex rel. Thompson v. Shain, 351 Mo. 530, 537(1), 173 SW. (2d) 406, 407(2); Dennis v. Wood, 357 Mo. 886, 892(2), 211 SW. (2d) 470, 474(4). See also Pearson v. K. C. Pub. Serv. Co., 359 Mo. 1185, 225 SW. (2d) 742, 743-4, on the time and distance element.

Respondent's second point is that under *appellant's* testimony there was no substantial showing he was in a position of imminent peril until he had turned his automobile into 59th street *and stopped* on the northbound streetcar track. On this point the decisions listed below[2] (and others) are cited on their facts. But the contention is really based on the *motorman's* own version of the casualty, as to the comparatively slow speed and nearness of the streetcar and the brisk speed, sudden swerving and stopping of the automobile. It assumes the latter could still [675] have escaped if it had continued on, notwithstanding the boy in the intersection.

And that may be true if appellant had realized his danger. But the two active parties were not in the same situation, and the appellant is entitled to the most favorable testimony in his behalf. The motorman admitted he knew the southbound discharged passengers were in that unloading zone, and there was testimony that other persons were in the northbound zone waiting to take his streetcar. He also knew he was not going to stop, but nevertheless proceeded at undiminished speed without sounding a warning, although he was aware of the deliberate course and progress of the automobile, and entitled to little if any reaction time. On the other hand the appellant, who had last seen the streetcar 100 feet away after turning his automobile and reducing speed, had the right to believe the streetcar would stop, or at least slow up and sound a warning for the busy intersection. He was not aware of the danger, and hence in peril. McGowan v. Wells, 324 Mo. 652, 664(5), 24 SW. (2d) 633, 638(4-5).

Some of appellant's witnesses said the automobile was moving 2-3 miles per hour, and some that it had stopped. The students Chandler and McCollum testified the streetcar was about 150 feet south at that time; the Pulhamus boy said 100 feet, when he was out in the intersection; and Miss De Lorenzi said it was 75 feet away when she looked. All agreed they heard no warning bell, and that the streetcar continued at undiminished speed. It ran on 300 feet after the collision. We think all this presents a composite picture, and do not agree with respondent's counsel that appellant's imminent peril did not begin

[2]Branson v. Abernathy Fur. Co., 344 Mo. 1171, 1178(1), 130 SW. (2d) 562, 565-6(2); The Steuernagel case, supra, 357 Mo. l. c. 907(2), 211 SW. (2d) l. c. 697(2); Robb v. St. L. Pub. Serv. Co., 352 Mo. 566, 178 SW. (2d) 443; Chenoweth v. McBurney, 359 Mo. 890, 224 SW. (2d) 114.

until the automobile *stopped* in front of the boy, if it did. For these reasons we overrule respondent's assignment so asserting.

■ Respondent's third point on this assignment is that under appellant's testimony it is a matter of speculation and conjecture whether the motorman in the exercise of due care could have avoided the collision by slackening speed or sounding a warning after appellant was in imminent peril. On this point the two decisions listed below[3] are cited. To them we add the Steuernagel case, supra, 357 Mo. l. c. 907(3), 211 SW. (2d) l. c. 697(3). In the Hunt case, supra,[3] the plaintiff was approaching a railroad crossing at 4 or 5 miles per hour and then accelerated his speed to 10 miles per hour in trying to get across. The train was 100 feet away approaching at an undiminished speed of 20-25 miles per hour. The plaintiff contended $\frac{1}{4}$ second more time would have saved him. The decision held this allowed no reaction time for defendant's engineer. That was also the deciding factor in the Steuernagel case supra.[1] In the Yeaman case[3] the facts showed a race for a street intersection between two automobiles, the driver of each being aware of the approach of the other. Here the motorman knew and the appellant did not know of the impending collision, absent preventive action. The humanitarian question turns on the speed and distance of the two vehicles.

■ Respondent's fourth point under the assignment is that appellant's instruction No. 1 was erroneous because it submitted conjunctively the two contradictory theories of (1) a negligent failure of appellant's motorman to slacken the speed of the streetcar, (2) *and* to sound a warning of its approach, citing Kick v. Franklin, 342 Mo. 715, 725(2), 117 SW. (2d) 284, 288 (2,3,4). Respondent's brief assumes the instruction meant the slackening of the streetcar's speed was to enable appellant's automobile to *cross* the track, whereas the sounding of a warning was to caution by the appellant to *stop*. The Kick case was reviewed on certiorari by this court en banc in State ex rel. Thompson, trustee, v. Shain, 349 Mo. 27, 38-40, 159 SW. (2d) 582, 588(17), and that decision held the instruction in the Kick case was founded on its own peculiar facts; and the opinion of the Court of Appeals was quashed in [676] part. See also Edwards v. Business Men's Assur. Co., 350 Mo. 666, 687(7), 168 SW. (2d) 82, 94(23).

We see no inconsistency in the instruction here. The automobile lacked only a little of being clear across the track and if the motorman had sounded the bell and slowed up it could have gone on or backed up. The jury evidently so found, and the trial court did not find to the contrary. It *overruled* respondent's motion for a directed verdict, and sustained its motion for new trial on procedural grounds—error

[3]Hunt v. Chicago, M., St. P. & P. R. Co., 359 Mo. 1089, 1093(1), 225 SW. (2d) 738, 741(2); Yeaman v. Storms, 358 Mo. 774, 778(2), 217 SW. (2d) 495, 498.

in the instructions and misconduct of a juror. We think no error is shown in the four points under this assignment.

Respondent's next assignment is that the foreman of the jury was guilty of prejudicial misconduct calling for a reversal of the verdict and judgment. At the hearing on the motion for new trial he testified by affidavit and orally that while the jury was deliberating he obtained from a librarian at the Kansas City Public Library a book giving the stopping distances of automobiles, including reaction time, on application of the brakes at various speeds. He made notes from that book, took them to the jury room, and read them to the other jurors. The only data he obtained that might be applicable here was for 20 miles per hour, and that a normal reaction time was ¾ second. At that speed the reaction time expressed in feet was 22, and the stopping distance with good brakes 28 feet, a total of 50 feet. He was corroborated in this by the affidavits of four jurors. There is no question about the facts. The notes were introduced in evidence.

The appellant contends all this evidence was incompetent, citing a long line of cases holding a juror will not be permitted to impeach the verdict. Some of these are referred to in the Court of Appeals opinion, 223 SW. (2d) l. c. 6. But the opinion also cited an old case [Pratte v. Coffman, 33 Mo. 71, 78(3)] which held that where *other* convincing evidence is presented the jurors' affidavits also may be considered. However, while it (the opinion) overruled respondent's instant contention, it did not do so on authority of the Pratte case, but on another ground. That ground was that the librarian's testimony and the foreman's testimony did not make a clear showing, because she could not identify him or the date of his visit to the library, nor could he identify her.

The Pratte case, supra, was overruled in State v. Branstetter, 65 Mo. 149, 156(5); 14 Mo. Law Review (3), l. c. 273, and has not been followed since. And the rule generally is as appellant contends, that the testimony is inadmissible whether the impeaching juror concurred in or dissented from the verdict. and whether his acts were committed inside or outside the courtroom.[4] It therefore was error for the court to admit this impeaching testimony coming from the jurors, if it was that.

But this cannot help respondent for it was the sponsor of the error. And furthermore, considering the testimony as in the record, the question is whether the jury foreman's efforts influenced the verdict as against the complaining party[5]—the respondent. And while that

[4]Cook v. Kansas City, 358 Mo. 296, 301(4), 214 SW. (2d) 430, 433(7-9); Bank of Malden v. Stokes, 220 Mo. App. 131, 135(8), 280 SW. 1055, 1057 (3-6); Reich v. Thompson 346 Mo. 577, 587(6), 142 SW. (2d) 486, 492(9); Steffen v. SW. Bell Tel. Co., 331 Mo. 574, 590(12), 56 SW. (2d) 47, 51 (16,17); Evans v. Klusmeyer, 301 Mo. 352, 364-5(4), 256 SW. 1036, 1039(7).
[5]Steffen v. SW. Bell Tel. Co., supra, 331 Mo. l. c. 591(12). 56 SW (2d) l. c. 52(17); Consolidated School Dist., G. V v. W. Mo. Pr. Co., 329 Mo. 690, 704(5), 46 SW. (2d) 174, 180(11).

issue was mainly for the determination of the trial judge, yet the appellate court may interfere in a proper case. For the trial court must exercise a *sound* discretion[6] in ruling on the issue, and there must be reasonable [677] ground for the belief that the jury was prejudiced, from which fact the court may presume the verdict was influenced.

That was not the situation here. The foreman of the jury, who made the excursion to the Library, testified he thought the motorman was entitled to reaction time. He sought information on that point and used his notes in so arguing to the jury. In other words he favored the defendant-respondent on the facts proven and sought to inject other facts. But notwithstanding his acts 10 of the jury signed a verdict for the plaintiff-appellant, only the foreman and one other juror refusing to concur. It is clear that the respondent was not prejudiced by the foreman's efforts.

The respondent maintains that while the foreman was guilty of misconduct, yet it was not an *impeachment* of the verdict such as is denounced by our decisions, but was mere proof of collateral circumstances which properly could be shown, citing: Lloyd v. St. L. Pub. Serv. Co., 360 Mo. 91, 227 SW. (2d) 460, 461(1); 46 C. J., § 370, p. 349, § 371, p. 350, § 372, p. 352; Mattox v. U. S., 146 U. S. 140, 13 S. Ct. 50, 36 L. Ed. 917. In this Lloyd case a jury, while deliberating in the jury room, sent an inquiry to the trial judge asking whether the testimony of a certain witness could be read to them again. The attorney for the defendant agreed, but the attorney for the plaintiff refused. There was some proof that these facts were communicated to the jury. They returned a verdict against the plaintiff, whose attorney had refused to let them hear the testimony read again. The trial judge granted a new trial on the ground that he had been guilty of an indiscretion in receiving and answering the communication. This court held the matter was within the discretion of the judge and refused to set aside the new trial order. As will be seen, the facts there were the reverse of those here.

 Defendant-respondent's last assignment is that the trial court's order granting it a new trial should be affirmed for a procedural reason. It asserts: (1) that under Sec. 115 of the Civil Code and our Rule 1.10 the plaintiff-appellant had the burden of demonstrating the trial court did *not* err in giving plaintiff's instructions 1, 3 and 4, and in refusing defendant's instruction 1; (2) that all these rulings were challenged in respondent's motion for new trial; (3) that the trial court in granting the new trial specified as one of the reasons "error in instructions"; (4) that this assigned general

---

[6]Middleton v. K. C. Pub. Serv. Co., 348 Mo. 107, 115-7(1-3), 152 SW. (2d) 154, 160 (6-8); Reich v. Thompson, 346 Mo. 577, 585-6 (2, 4), 142 SW. (2d) 486, 491 (4, 7); Rose v. Thompson, 346 Mo. 395, 401(1), 141 SW. (2d) 824, 827(1).

ground necessarily included all of the instructions above referred to; (5) and that in view of appellant's failure to brief all these points the order granting the new trial should stand and the cause be remanded for a new trial.

*Sec. 115* of the Code just referred to, provides in part: "A new trial may be granted for any of the reasons for which new trials have heretofore been granted. * * * Every order allowing a new trial shall specify of record the ground or grounds on which said new trial is granted." This latter is a literal repetition of what was already provided in Sec. 1169, R. S. 1939, Mo. R. S. A.

*Rule 1.10,* just referred to, provides in part: "When a trial court grants a new trial without specifying of record the ground or grounds on which the new trial is granted, the presumption shall be that the trial court erroneously granted the motion for new trial and the burden of supporting such action is placed on the respondent * * *." The last word, "respondent", in the Rule evidently does not refer always to the respondent in the cause, but to the party *in whose favor* the new trial was granted.

The question in this case under both the Code provision and the Rule is, how specific the order granting the new trial must be as to the "reasons" or "grounds" therefor. Both use the word "specify" or "specifying". And the statement in the Code section 115 that a new trial may be granted for any of the *reasons* for which new trials have heretofore been granted, refers to Sec. 1168, R. S. 1939, Mo. R. S. A., the new trial statute which has been in force for many years. [678] That section includes "a misdirection of the jury by the court" as one of the reasons—which would cover instructions to the jury.

On this point respondent's brief here cites two cases.[7] In the Bartley case the order granting the new trial was: "for the reason that the court committed error in giving and refusing to give instructions to the jury on the trial of this cause." The opinion said: "This is a compliance with the letter, but not the spirit or reason of (citing the new trial statute now Sec. 1168, supra). No index is thereby afforded to the error the (trial) court believed it had committed." The decision then surmised what the moving cause of the trial court's action must have been, and reversed and remanded the cause for error in the ruling on that assumed ground.

Likewise, in the Mendenhall case,[7] the trial court's order granting the motion for new trial was: "the court doth sustain plaintiff's motion for new trial on the ground that the court erred in giving defendants' instructions 8, 10 and 12 * * *." Again this court said: "This order may comply with the letter, but we think not with the spirit of Sec. 1169." Then it went on to say: "the better

---

[7]Bartley v. Met. St. Ry. Co., 148 Mo. 124. 138(1), 49 SW. 840, 844; Mendenhall v. Neyer, 347 Mo. 881, 894(6), 149 SW. (2d) 366, 374.

practice for facilitating the administration of justice in review proceedings calls for a more detailed specification of the ground or grounds for new trial.'' Continuing the opinion said that was especially true in that case because the order granting the new trial did not disclose whether the errors denounced. were of fact or law. And the order granting a new trial was reversed and the cause remanded with directions to reinstate the verdict.

In the instant case the court's order not only failed to specify whether the errors upon which it based its ruling were of law or of fact; but failed even to specify what instructions it thought were erroneous. Furthermore, the respondent assumed the burden in the Court of Appeals of pointing out which instructions given or refused, were correct or incorrect, and specified only plaintiff's instruction 1 (on the facts) and instruction 2. And here also it refrains from discussing them—except plaintiff's instruction 1 (again on the facts); and plaintiff's instruction 2, which it concedes was correct in the light of a decision rendered by this court after this cause was submitted in the Court of Appeals. It does not discuss plaintiff's instructions 3 and 4, or its refused instruction No. 1. Having made the selection and assumed the burden, it cannot complain here of the ruling on these latter three instructions. King v. K. C. Life Ins. Co., 350 Mo. 75, 86(4), 164 SW. (2d) 458, 464(7).

For the foregoing reasons the order of the trial court granting respondent a new trial is reversed, and the cause remanded with directions to reinstate. the verdict and judgment. *Hollingsworth, Dalton* and *Leedy, JJ.,* concur; *Conkling, J.,* dissents in separate opinion filed; *Tipton, J.,* and *Hyde, C. J.,* dissent and concur in dissenting opinion of *Conkling, J.*

CONKLING, J. (dissenting).—█ While I concur in the holding of the principal opinion that the testimony of the jurors was not admissible to impeach the verdict, it is my further view that whether ''the jury foreman's efforts influenced the verdict'' is not before us for discussion or ruling. I think that the trial court erred in granting the new trial upon claimed ''misconduct of a juror.''

█ But I further think it was error to submit the case to the jury upon the theories of negligence set out in instruction 1. From a study of this transcript I think there is no evidence, and it seems to me that it is not fairly and legally inferable [679] from any fact or circumstance in evidence, that a failure to slacken the speed of the street car or that a failure to sound a warning of its approach was a proximate cause of the collision.

Believing the trial court erred in giving instruction 1, I would affirm the order granting the new trial.